JOHN H. BOWDITCH v. FRENCH BROAD HOSPITAL, INC.

(Filed 27 June, 1931.)

1. **Hospitals C a—Private hospital is under duty to exercise due care in treatment and care of its patients.**

    A hospital operated for profit is held to the duty of exercising ordinary care in the treatment and care of its patients, and is responsible for injuries resulting from failure to perform such duty.

2. **Same—Hospital has no duty to obtain patient's discharge by his physician and acts of nurse relating thereto are beyond scope of employment.**

    Where a patient in a hospital operated for profit selects his own physician the hospital owes no duty to the patient to obtain his discharge by the physician, and where there is evidence that the patient requested a nurse furnished by the hospital to find out from his physician whether he could go home, and if the discharge was obtained to bring him his bill, and that the nurse shortly thereafter had the bill presented to him, whereupon he went home, causing permanent injury by his premature discharge: *Held*, the acts of the nurse relating to obtaining the discharge were beyond the scope of her employment and the hospital is not liable therefor.

CIVIL ACTION, before *Schenck, J.,* at January Term, 1931, of YANCEY.

The plaintiff alleged that on 25 July, 1927, while working at a mine, he sustained a personal injury to his right hip and right leg, and that he was taken to the defendant hospital for treatment; that said hospital is a private hospital, organized and operated for gain; that he procured a room and Dr. Clark, a member of the staff of said hospital, was called to render treatment; that he remained in the hospital for about four days when "some discussion arose as to the plaintiff returning home. The nurse in charge was advised by the plaintiff that he did not desire to return home unless with the consent of the attending physician, and he was thereupon advised that the attending physician would be called, and that if he advised the discharge of plaintiff that hospital bill would be presented and the plaintiff discharged. The plaintiff was entirely dependent upon the defendant and its agents and servants in charge for such information. That the nurse in charge, after reporting to the person in managerial charge of the defendant's hospital, soon returned with the bill for services rendered, which was duly paid, and the defendant was then and there discharged from the hospital of the defendant, and he returned home a distance of about forty-five miles to Micaville, N. C.

The plaintiff further alleged that as a matter of fact his leg was broken, and that in riding over rough roads for a considerable distance

to his home the bones scraped together, causing him great pain and suffering, and resulting in permanent injury.

The defendant filed an answer denying all allegations of negligence.

Issues of negligence, contributory negligence and damages were submitted to the jury and answered in favor of plaintiff. The verdict awarded damages against the defendant in the sum of $4,616.67.

The evidence tended to show that when the plaintiff was hurt he sent for Dr. Robinson, and that said physician advised him to go to the defendant hospital "and call for Dr. Clark." The plaintiff arrived at the hospital between five and six o'clock and some one sent for Dr. Clark. Arrangements were made by the plaintiff to secure a $35 per week room.

The narrative of events, as detailed by the plaintiff, is substantially as follows: They wanted to know what doctor I wanted, and I told them Dr. Robinson told me to call for Dr. Clark. . . . He afterwards came. I was suffering pretty bad and don't remember exactly, but he came in an hour and a half or two hours. . . . There was a lady that came up the first afternoon that I took to be the clerk, but don't know who she was, except I know she was not a nurse, and she said: "If you've got any valuables, I will take them to the office." So I had some money and my watch and gave them to her and she took them out of the room. . . . Dr. Clark came in the afternoon and examined me and says: "We will have to have an X-ray made of that right hip and see what kind of an injury you have. I don't believe you have got anything but a bad sprain and a bad bruise." . . . A day nurse and a night nurse attended on me—one during the day and one during the night. I was discharged from the hospital on Thursday afternoon. Dr. Clark had told me that I had a bad sprain and bruise and said, "If you want to go home, I don't see why you can't do as well at home as you can here," and I said, "I am a poor man and unable to pay hospital expenses if I can get out of paying them." So, on Thursday morning I asked the nurse and said, "Did the doctor say anything about me getting off?" She said, "He hasn't said anything to me about you leaving, but if the doctor says you haven't got anything but a bruise, don't see why you can't go." I said, "I would like to go home if I don't have to stay; would like to be at home if I can do as well at home." There wasn't anything more said about it until that afternoon when she came around about 1 or 2 o'clock, and I said, "Have you seen the doctor yet?" and she said, "No, sir," and I said, "I think some of my people will be here this afternoon and I would like to go home," and she said, "I haven't seen the doctor yet—don't know whether he is going to be over here in the hospital or whether he is out of town; don't know where he is." That afternoon my wife and some neighbors came to see

me. I said to the nurse that came in with them: "Nurse, I want to go home this afternoon, but I am not going to leave here without the doctor's—without a discharge from the doctor," and she said, "I will go and see the doctor or will call him and see if you can get a discharge." She went out again, and I judge this was about four or five o'clock. When she came back there was another lady with her. This lady had my pocket-book and watch and my bill, and she said, "Here is your money." I took the money, and said, "How much is my bill?" She handed me the bill and I paid it. The lady that brought my pocket-book and money was the same lady that took my pocket-book and money. The nurse said if the doctor ordered me discharged, she would have my bill sent up. . . . I left the hospital that evening. After I paid my bill I left as quick as the boys could put me on a stretcher and carry me down and put me in the car. . . . On the way home every time we would turn a curve either way it was just like a knife running through my hip. When my leg would creak a little, I would feel something like a grinding—like two somethings rubbing together. . . . I don't remember what time we got home. . . . Dr. Robinson was there when we drove up, or came a few minutes later. Dr. Gibbs came to see me two or three or four days after I got home, and he gave me a thorough examination, and told me to go to the hospital at Erwin, Tennessee, and I went there immediately. Dr. Stack treated me at Erwin. . . . My leg is about two inches short, and I can't raise it up nor put it on the floor without taking my hand and raising it up.

Plaintiff further testified with respect to the facts relating to his discharge from defendant hospital as follows: After I decided to go, I asked the nurse to get in touch with Dr. Clark, and I says: "I wish you would find Dr. Clark and see if he will let me go."

The nurse who attended the plaintiff was Miss Bettie McGuire. She was a student nurse and had been in training two years and three months, and testified that the plaintiff told her he was going home, and that she tried to get in touch with the physician but failed to do so, and upon reporting the information to plaintiff, he said, "he couldn't wait and had to go home." There was uncontradicted evidence that the duties of a student nurse at the hospital were to carry out any orders the doctors left and to observe the hospital rules, and that student nurses had no authority to discharge patients from the hospital, and that the doctor in charge had sole and exclusive right and authority to discharge patients.

From judgment upon the verdict the defendant appealed.

*Watson & Fouts and Charles Hutchins for plaintiff.*
*Harkins, Van Winkle & Walton for defendant.*

BROGDEN, J. Is a private hospital, operated for gain, liable in damages for the act of a nurse, who induces a patient to conclude that his physician has discharged him from further treatment?

The plaintiff was a patient in the hospital of defendant. He was under the care and treatment of his own physician. The hospital, therefore, was not liable for the acts of the physician, but the hospital furnished a nurse who was required to obey the instructions and orders of the doctor. The plaintiff, having information from the physician, that his injuries were not serious, was anxious to return to his home, but was unwilling to do so unless he was discharged by the physician. He states in his testimony, "After I decided to go I asked the nurse to get in touch with Dr. Clark." I said: "I wish you would find Dr. Clark and see if he will let me go." The nurse, according to plaintiff's testimony, informed the patient that if the doctor ordered him discharged, she would have his hospital bill sent to his room. Shortly thereafter the nurse returned to the room with another lady, who presented the hospital bill and other valuables which the plaintiff had left in the care of the hospital, and thereupon the plaintiff paid the bill and left the hospital. It seems that the plaintiff did not ask the nurse upon her return whether she had communicated with the doctor or whether the doctor had consented to his discharge, but he assumed that the physician had consented to his discharge by reason of the fact that the bill was presented. It developed that the nurse had not communicated with the physician and that he had not consented to the discharge.

A private hospital, operated for profit, is held to the duty of ordinary care in the treatment and protection of patients, and is responsible for injuries resulting from failure to perform such duty. *Johnson v. Hospital,* 196 N. C., 610; *Penland v. Hospital,* 199 N. C., 314.

The liability of hospitals for the negligence of nurses employed or furnished by the hospital, is a question of law which has created widely divergent theories. For instance, the Court of Appeals of New York, in the case of *Schloendorff v. Society of New York Hospital,* 105 N. E., 92, in an opinion by *Cardoza, J.,* stated the doctrine in these words: "It is true, I think, of nurses, as of physicians, that, in treating a patient they are not acting as the servants of the hospital. The superintendent is a servant of the hospital; the assistant superintendent, the orderlies, and the other members of the administrative staff are servants of the hospital. But nurses are employed to carry out the orders of the physicians, to whose authority they are subject. The hospital undertakes to procure for the patient the services of a nurse. It does not undertake, through the agency of nurses, to render those services itself. The reported cases make no distinction in that respect between the position of a nurse and that of a physician." Subsequently, the same Court

considered the question in the case of *Renouf v. New York Central R. Co.,* 173 N. E., 218. The opinion was written by *Pound, J.,* who, in discussing the status of the nurse, says: "They are regarded as especially equipped to render professional services to patients when called on to do so rather than as workmen. They are grouped with doctors and lawyers rather than with cooks and chambermaids. This rule of relationship between employer and nurse is not limited in its application to charitable corporations, although it has often been applied to relieve such corporations from liability for the negligent acts of physicians and nurses employed by them in the treatment of patients. It rests on the fact that one who employs such a nurse to take care of an injured person undertakes, not to treat the employee through the agency of the nurse, but to procure a nurse for the special purpose for which her services are required. This is all that the railroad company did in this case. It procured the nurse, but it did not act through her in caring for the patient. She was left to act on her own responsibility under the general direction of the physician in charge of the case. Although she was, in a general sense, employed by the railroad company, she was not its employee. She occupied the position of an independent contractor following her own calling rather than that of one in the service of the employer. The fact that she was employed by the railroad company rather than the hospital in no wise alters her status." *Phillips v. Buffalo General Hospital,* 146 N. E., 199. The Court of Louisiana takes the same view of the question as the Court of Appeals of New York. See *Jordan v. Touro Infirmary,* 123 Southern, 720. Many authorities are cited to support the opinion. The courts of Alabama, Oklahoma, Idaho and Kentucky adopt the general theory that nurses in a hospital are employees and not independent contractors, and hence the hospital is liable to a patient who suffers injury through the negligence of the nurse. *Norwood Hospital v. Brown,* 122 Southern, 411; *Birmingham Baptist Hospital v. Branton,* 118 Southern, 741; *Skidmore v. Oklahoma Hospital,* 278 Pacific, 334; *Hayburst v. Boyd Hospital,* 254 Pacific, 528; *Hicks, Admr., v. Harlan Hospital,* 21 S. W. (2d), 125. See, also, 22 A. L. R., 341; 39 A. L. R., 1431.

A decision, determining the merits of the case now under consideration, does not require this Court to adopt either theory of liability applied in the foregoing cases from other jurisdictions.

In the case at bar the plaintiff selected his own physician. Therefore, the hospital assumed no liability and was charged with no responsibility for the medical treatment of plaintiff or the time when the relationship of patient and physician should be terminated by discharge of the patient. Nor was the hospital, under the circumstances, charged with any duty in procuring a termination of the relationship of patient

and physician. Hence, if no such duty was imposed upon the defendant, and if it did not assume the performance of such duty, then there is no negligence upon its part, and consequently, no liability.

The record discloses that the patient requested the nurse to secure for him certain information from his physician. Assuming that the nurse negligently failed to do so, it is apparent that she was acting upon the request of plaintiff in a matter with which the defendant hospital was not concerned. In apt time the defendant requested the court to charge the jury as follows: "The court charges you that if you find from the evidence, and by its greater weight, that the plaintiff went to the French Broad Hospital, and employed Dr. H. S. Clark as his surgeon, who assumed the charge of the case, then the court charges you that the relationship of physician and patient was established. And if you further find from the evidence, and by its greater weight, that Miss Betty McGuire was a student nurse in the French Broad Hospital and was assigned to the plaintiff's case for the purpose of carrying out the orders and instruction of Dr. Clark in the treatment and care of the plaintiff, and that she undertook, at the instance of the plaintiff, or at the suggestion of the plaintiff, or upon her own motion in behalf of the plaintiff to procure the consent of Dr. Clark to the plaintiff's returning home, that the court charges you that the said Betty McGuire was the agent of the plaintiff, and not the agent of the defendant hospital, and that her act in so doing was not the act of the hospital, and the hospital is not bound by her said act, and the defendant hospital would not be liable for her act, and you will answer the first issue, "No."

The court declined to so instruct the jury, and the exception of the defendant to such refusal is error, and a new trial is awarded.

New trial.