MRS. ALICE BYRD v. MARION GENERAL HOSPITAL, DR. J. F. MILLER AND MRS. J. F. MILLER.

(Filed 2 March, 1932.)

1. **Hospitals D a—Nurse is not liable for injury caused by executing orders of physician unless it is apparent that injury would result.**

   Nurses in a hospital in the discharge of their duties must obey and diligently execute the orders of the physician or surgeon in charge of the patient, and they will not be held liable for injury resulting to the patient from executing such orders unless such orders are so obviously negligent as to lead any reasonably prudent person to anticipate that substantial injury would result to the patient therefrom.

2. **Same—Evidence in this case held insufficient to be submitted to jury in action against nurse for injury to patient.**

   Where a family physician diagnoses the condition of his patient and prescribes that she be removed to a private hospital and given treatment in an electric heat cabinet, an appliance approved and in general use, and is present with the nurse attending the patient and sees and approves of the way the body of the patient is prepared for the treatment and directs that the patient remain in the cabinet a certain length of time, and injury results to the patient from being burned: *Held,* the injury must have resulted from one of three causes, and if it resulted from the peculiar susceptibility of the patient to heat due to her condition it resulted from an error in diagnosis by the physician, or if it resulted from the length of time the patient was kept in the cabinet, the length of time was expressly prescribed by the physician, or if it resulted from improper preparation of the body of the patient for the treatment, the physician was present and knew what preparations had been made, and under the circumstances the treatment of the nurse was the treatment of the physician, and the nurse cannot be held liable for the injury, it not being apparent that substantial injury would result from the execution of the physician's orders.

3. **Hospitals C a—Where nurse is not liable for injury to patient the hospital cannot be held liable as her employer.**

   Where an injury to a patient is not attributable to any negligence of the attending nurse the owner or lessee of the hospital employing the nurse cannot be held liable on the doctrine of *respondeat superior.*

**4. Negligence A c—Where all facts causing injury are known the doctrine of res ipsa liquitur does not apply.**

> Where all the facts causing an injury are known and testified to by the witness the doctrine of *res ipsa loquitur* does not apply.

CIVIL ACTION, before *Sink, J.,* at July Term, 1931, of McDOWELL.

The defendant hospital is a corporation, and it was alleged that said corporation was engaged in running a general hospital for the treatment of diseases. It was further alleged that the defendant, J. F. Miller, was a physician and surgeon, and by virtue of some contractual relationship between him and the hospital, was engaged in the operation and management thereof, and that Mrs. J. F. Miller, the wife of defendant, Miller, was assistant superintendent or assistant manager. The hospital filed an answer alleging that the defendant, Dr. J. F. Miller, had leased the hospital and was operating it on his own account at the time of plaintiff's injury.

A summary of the evidence is as follows: The plaintiff is the wife of Frank Byrd and had given birth to a child on or about 16 January, 1929. Plaintiff's physician was Dr. Bingham, who had no connection whatever with any of defendants, but was engaged in the general practice of medicine. Dr. Bingham had been treating plaintiff and advised the husband of plaintiff that she was threatened with convulsions. He said if she did to rush her up there to the hospital and have them sweated out. Dr. Miller had never seen my wife up to that time. Up to the time the child was born Dr. Miller never was my doctor. Up to the time she was treated in this electric cabinet he never had been my doctor. . . . Dr. Bingham was the man who sent her to the hospital. . . . Dr. Bingham was the man who prescribed this sweat cabinet treatment and the only doctor I had. He was the last one and I followed his advice. I never took any advice from Dr. Miller at all about what treatment to give my wife. So far as I know Dr. Miller had never seen me in my life.

On 22 January, the plaintiff began having convulsions and her husband and certain friends of the family placed the plaintiff in an ambulance and took her to the hospital in order that she might be treated in the "sweat cabinet" owned and operated by the Millers, and sometimes referred to as a baking machine or radiation cabinet. This appliance is a metal box about two and a half feet wide and about two feet high. The top is oval shaped. In front there is a glass window so that anyone can look in and see the patient. One end has a curtain over it and there is a padding upon which the patient lies. The cabinet was equipped with forty electric lights controlled by four switches, there being about ten

lights to each switch. Each bulb carried about forty volts. The head of the patient is not within the machine. The curtain referred to drops below the head, leaving that part of the body totally outside the machine. The undisputed evidence from experts and disinterested witnesses tended to show that the appliance was known as the Burdick type of machine, and that the mechanism was approved and in general use. Dr. Hall, teacher of zoology and physiology at Duke University, testified: "I have used the Burdick cabinet for seven or eight years in my experimental work. I am familiar with the construction and operation of these Burdick cabinets. They are used universally in hospitals. I think nearly every hospital of any size has a similar type of cabinet. . . . It was used during the World War."

The defendant, Mrs. J. L. Miller, testified that on 22 January, 1929, Dr. Bingham called the hospital and that she answered the telephone; that Dr. Bingham called for Dr. Miller, and that witness informed him that Dr. Miller was out of town; that thereupon Dr. Bingham said: "I have a patient that I am sending in that I want sweated in the sweat cabinet immediately, and I will be right along, and you go down and get it ready." In a few minutes the plaintiff, with her friends, arrived at the hospital and Mrs. Miller, who was superintendent of nurses, received the plaintiff and proceeded to prepare her for the sweat cabinet. All her clothing was removed except a light vest, a light gown and an abdominal binder. The plaintiff was then unconscious and was having convulsions about every five minutes.

At this point there is a divergence in the evidence. Mrs. Miller and her witnesses testify that Dr. Bingham came before the plaintiff was placed in the cabinet. The husband of plaintiff testified: "I couldn't say whether Mrs. Miller had placed my wife in this sweat cabinet before Dr. Bingham came in or not." Subsequently he testified: "I won't be positive, but I think I saw my wife in the sweat cabinet before Dr. Bingham got in there." Another witness for plaintiff testified: "After I got there I would say it was at least ten minutes, if not longer, until Dr. Bingham showed up." A witness for plaintiff also testified that she was informed that a hypodermic had been given to the plaintiff a few minutes after she was placed in the cabinet. The hands and feet of plaintiff were tied in order to eliminate the possibility of breaking the electric lights and inflicting cuts during her struggles when seized with convulsions.

Dr. Bingham was not examined as a witness by either party. The defendants, however, offered the testimony of a neighbor of the plaintiff, to wit, Mrs. Davis Bright, who went with her to the hospital. She testified that when the plaintiff was put in the cabinet that Dr. Bingham

was present and going in and out from the cabinet room, and that he directed Mrs. Miller to fix a hypodermic and give it to the plaintiff; that Mrs. Miller requested Dr. Bingham to watch the patient while she prepared the hypodermic. After administering the hypodermic Mrs. Miller asked Dr. Bingham: "How long do you want this patient to stay in here?" and he said: "How long has she been' in?" She said: "About thirty minutes." He said: "Let her stay in about ten minutes longer." The nurse who assisted in preparing the plaintiff for the treatment, testified that Dr. Bingham was present at the time the patient was placed in the cabinet, and that she kept a cold cloth on Mrs. Byrd's head, and that Dr. Bingham prescribed the hypodermic which was given by Mrs. Miller. Reverend J. S. Lockaby, rector of the Episcopal Church in Marion, who was in the hospital, testified that he heard the conversation between Mrs. Miller and Dr. Bingham; that he went down and stood in the door of the cabinet room during the time Mrs. Byrd was there, and that Dr. Bingham was present.

The defendant offered the testimony of several witnesses who had been treated frequently in the machine, and the treatment was administered to the naked body and no ill effects resulted. The evidence for defendants tended to show that Mrs. Byrd was suffering with oedema, but there was evidence to the contrary. The defendant also introduced many experts who testified that the treatment of plaintiff by means of dry heat was an improper method of treatment.

Plaintiff introduced evidence of a physician who testified that if the plaintiff had been properly prepared, "covered with Turkish towels, you couldn't burn her." Witness further testified that he had never used a machine like the one in controversy or had never served in a hospital where one was used, and that he knew nothing about the particular type of appliance.

In a few hours after plaintiff was removed from the sweat cabinet it developed that she had suffered serious and painful burns. Her legs and body were severely burned, resulting in the sloughing of tissue and causing exceedingly serious and permanent injuries.

No judgment was sought against the hospital and the following issues were submitted to the jury:

1. "Was the injury to plaintiff caused by the negligence of the defendants, as alleged in the complaint?"

2. "What damage, if any, is the plaintiff entitled to recover of the defendants?"

The jury answered the first issue: "As to Dr. J. F. Miller, yes."

The second issue was answered in the sum of $29,975.

From judgment upon the verdict the Millers appealed.

*D. F. Giles and A. Hall Johnston for plaintiff.*
*Johnson, Smathers & Rollins and T. A. Uzzell for defendant.*

BROGDEN, J. What duty does a nurse owe to a patient?

At the outset it must be observed that no judgment was sought against the hospital or the physician of plaintiff who directed that she be sent to the hospital and given the specific treatment, which is the basis of plaintiff's cause of action.

The great majority of cases discussed in the books involve the liability of hospitals for the negligence and inattention of nurses. The liability rests upon the theory that the nurses in discharge of their duties are agents or servants of the hospital. In this case, however, the liability is asserted against the nurse personally, and against her husband who was the lessee of the hospital upon the principle of respondeat superior.

The general rule of legal liability imposed upon hospitals, nurses and physicians undertaking to treat patients are succinctly expressed by *Stacy, C. J.,* in *Pangle v. Appalachian Hall,* 190 N. C., 833, 131 S. E., 42, as follows: "Ordinarily, when a hospital, like the present one, undertakes to treat a patient, without any special arrangement or agreement, its engagement implies three things: (1) that its physicians, nurses and attendants possess the requisite degree of learning, skill and ability necessary to the practice of their profession, and which others similarly situated ordinarily possess; (2) that its physicians, nurses and attendants will exercise reasonable and ordinary care and diligence in the use of their skill and in the application of their knowledge to the patient's case; and (3) that its physicians, nurses and attendants will exert their best judgment in the treatment and care of the case." See, also, *Johnson v. City Hospital,* 196 N. C., 610, 146 S. E., 573; *Bowditch v. French Broad Hospital,* 201 N. C., 168; *Schloendorff v. Society of N. Y. Hospital,* 21 S. W. (2d), 125; *Norwood Hospital v. Brown,* 122 Southern, 411, 22 A. L. R., 341; 39 A. L. R., 1431. These cases and others of like tenor support and fortify the measure of liability expressed in the *Pangle case, supra.*

The great weight of authority, however, establishes the principle that nurses, in the discharge of their duties, must obey and diligently execute the orders of the physician or surgeon in charge of the patient, unless, of course, such order was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient from the execution of such order or performance of such direction. Certainly, if a physician or surgeon should order a nurse to stick fire to a patient, no nurse would be protected from liability for damages for undertaking to carry out the orders of the physician. The

law, contemplates that the physician is solely responsible for the diagnosis and treatment of his patient. Nurses are not supposed to be experts in the technique of diagnosis or the mechanics of treatment.

The evidence in this case discloses without contradiction the following vital and pertinent facts:

(a) That Dr. Bingham was the physician of plaintiff, who directed that the plaintiff be placed in the custody of defendants or taken to the hospital.

(b) That he examined the plaintiff and diagnosed her disease.

(c) That he specifically prescribed the immediate treatment in the sweat cabinet owned and operated by the Millers.

(d) That he was present at the time the treatment was administered. While there is a conflict in the evidence as to whether he was present when the plaintiff was prepared for the cabinet or when the treatment was actually commenced, there can be no controversy that he was present within ten or fifteen minutes from the time she was placed in the sweating machine.

(e) That the physician, within a few minutes from the time the plaintiff was placed in the cabinet, was thoroughly advised as to how she was prepared for the treatment and the general methods and progress thereof. Indeed, it appeared, without contradiction, that he prescribed a hypodermic during the course of the treatment.

(f) That the physician, being present at the time, directed the nurse specifically to keep the plaintiff in the cabinet for a period of thirty minutes.

(g) That the appliance was approved and in general use, and there is no evidence of any defect in the instrumentality or of excessive heat.

(h) There is no evidence whatever that the defendant, Mrs. Miller, was incompetent or that she did not possess that degree of skill which the law requires, or that, in operating the machine, she failed to exercise the degree of care which the law deems essential.

From the foregoing facts it must be manifest to any impartial mind that the serious and distressing injuries of the plaintiff resulted from one or all of the following factors: (a) her body was improperly wrapped before being exposed to the heat; (b) that she was suffering from some disease rendering her unusually sensitive to heat application; (c) that she was retained in the cabinet for too great a period of time.

If the injury resulted from a peculiar condition of plaintiff's body, producing unusual or abnormal susceptibility to heat, then this was a matter of diagnosis and lay exclusively within the duty of the physician, unless, of course, as hereinbefore indicated, the type of disease was so

pronounced and so well known as to lead the nurse in the exercise of ordinary care to anticipate injury. However, upon that aspect, there is no evidence.

If the injury resulted from subjecting the patient to the heat of the cabinet for an excessive period of time, then the evidence disclosed that such period of time was actually prescribed by the physician who was present during the treatment.

The only aspect, therefore, upon which the liability of the nurse or of her husband, upon the principle of respondeat superior, can be based, is that the patient was improperly wrapped or covered before the treatment was administered. Obviously, if a patient is carried to a hospital by the order of a physician and the nurse undertakes to administer a treatment without instruction from the physician, or when the physician was not present, she will be held liable in damages for any failure to exercise ordinary care, and consequently, would administer such treatment at her peril. But, upon the other hand, if the physician is present and undertakes to give directions, or, for that matter, stands by, approving the treatment administered by the nurse, unless the treatment is obviously negligent or dangerous, as hereinbefore referred to, then in such event the nurse can then assume that the treatment is proper under the circumstances, and such treatment, when the physician is present, becomes the treatment of the physician and not that of the nurse.

Upon the whole evidence the court is of the opinion that, even if it be conceded that the body of plaintiff was not properly prepared for the treatment when her physician stood by without protest or direction, and being fully cognizant of the condition of her body and of all the facts and circumstances surrounding the treatment, the preparation of the body was a part of the treatment prescribed by the physician. Moreover, there is an abundance of evidence, and none to the contrary, that the heat was usually applied to a nude body, resulting in no harmful consequences. So that, there was nothing to indicate to the nurse that the preparation of the body of plaintiff with the acquiescence and implied approval of the physician was obviously dangerous or likely to produce harm.

Of course, if Mrs. Miller was liable in damages, her husband would also be liable because he operated the hospital and employed his wife as superintendent of nurses. Hence if Mrs. Miller is not liable in damages, no recovery could be sustained against her husband.

The court, in reaching a conclusion, has given full consideration to the application of the principle of *res ipsa loquitur.* All the facts causing the injury are known and testified to by various witnesses at the

trial. Hence the doctrine is not applicable for the reasons pointed out in *Springs v. Doll,* 197 N. C., 240, 148 S. E., 251.

The court concludes upon all the evidence and upon the proper application of the pertinent rules of liability, that the motion for nonsuit, duly made, should have been granted.

Reversed.