CONNOR, J., dissenting.
This was a civil action for actionable negligence, instituted by plaintiff against defendant, in which she alleges damages. The plaintiff contends, and it is admitted by the defendant, that in January, 1929, she submitted herself to Dr. W. B. Dewar, of Raleigh, North Carolina, for a thorough examination and that plaintiff consulted the defendant and after an examination by the defendant that the defendant advised an operation and that defendant operated upon plaintiff at Rex Hospital in the city of Raleigh.
The plaintiff testified, in part: "We have one little girl who is five years old; after the birth of this child I have had physical trouble. . . . I went to see Dr. Dewar and he made a physical examination, and in consequence of what he told me I consulted Dr. Royster. When I went to Dr. Royster's office he gave me a physical examination, and he *Page 386 
told me that my womb was misplaced, and in my then condition that it would be impossible for me to give birth to a child and he told me that the pain I was suffering was probably coming from my womb — that it was misplaced — fallen, and I had lacerations that should be attended to, and several other things should be done, and that I should be operated upon as soon as possible. This was in January, about the middle of January, 1929, I believe, and I asked him if he thought it would be all right to wait until March and he said he thought it should be done immediately, and I asked him what he meant by immediately, and he said he thought if I could possibly do so I should go tomorrow night and he would operate on me Thursday morning. . . . I went to the hospital on Wednesday night and was operated on on Thursday morning. . . . He made an incision in my right side and it looked as though it might have been for the appendix; it is about four inches long. Before I was operated on I was told that it would be a middle line incision, and when I found that it was not I asked Dr. Royster about it and he said that he had made all repairs and done everything through that incision that could not be done through the vagina. I was carried back to the room. . . . I seemed to be improving and went home in two weeks. After I got home I was in bed part of the time and up part of the time. I began to feel very much better and I was very well pleased with my condition, and I thought I was going to be rid of my suffering and I felt well for two or three months, and I think it was sometime in April. . . . I walked out in the year and picked up a rake, and ran a little trench for planting flower seed, and as I bent over I had a pain that struck me in the bottom of my stomach; in my body from the waist down, and it seemed to be in the very bottom of my stomach. . . . I sat on the edge of a chair and placed my finger on the mouth of my womb and I felt something touch it, it felt like a wiry hair, and I thought it was one of the things that they used in sewing up lacerations with, and I had taken them out before on several occasions, and I kept working it more and more and it went back so far I could not touch it at all, and then again I sat down in the same position and strained myself, and I worked at it until it slipped out in my hands, and I still thought it was one of those things that they use to sew up with, and when I looked at it I could not tell what it was, it was covered with a filmy mucus, and I wiped it off and it was a jagged piece of glass; it was a piece of glass almost an inch long with jagged ends, and it looked like it had been part of a tube, and it was rounded. It was concave and it was not flat, and almost one inch long with jagged edges. This was right after lunch. I took the piece of glass; I could not believe that it was glass, and I kept rubbing and looking at *Page 387 
it, and I thought what should I do, and I was in the house alone. I think I laid the piece of glass on the mantel, and I wondered if I should call my husband, and it occurred to me that it would worry him. I laid the piece of glass down and I walked around the house all Sunday afternoon; I did not go out of the house, and just could not get myself composed. . . . I went to bed about eight o'clock and I dropped off to sleep, and the next thing I knew my husband was standing over me, asking me what was the matter; this was between eight-thirty and nine o'clock. He brought Dr. Royster with him. Dr. Royster came that night about an hour after my husband telephoned. He brought Dr. Dewar with him. When they came in the room I was in bed, and Dr. Royster spoke to me kindly and asked me how I was feeling, and he asked me to tell him how I was feeling and how it happened, and I told him beginning with Saturday afternoon, and he said `I will make a slight examination now and see if I can tell whether or not there is more glass,' and he did, and after he did that Dr. Dewar sat down by the side of my bed and Dr. Royster was at the foot, and after they sat there and talked about it, and they said they could not understand how it was, and what it was, they asked to see the glass; any way my husband brought it and started to put it into the hands of Dr. Royster and Dr. Dewar took it, and they both looked at it, and Dr. Dewar was by the table and he laid it down and he said it looked like a capsule, and I do not know what instrument he had in his hands, but he began to crunch that instrument with the piece of glass, and he talked about what it could be, and I reached over and took the glass up and handed it back to my husband, and Dr. Royster said `You need not worry because there is no more there, and you just go to sleep and come to my office tomorrow and let me make a thorough examination.' The next morning I went to his office. When I got to his office he said there was no use to make an examination because the examination would not reveal anything, and he said `the only reason I examined you last night was to relieve your mind, I wanted you to feel that it was all right,' and he was sympathetic and kind to me. . . . I said how about having another operation, and he said I cannot guarantee that it would be found if it were there, and he said you can rest assured that there is no more glass. I went back home. About a month after that during a menstruation period I felt a piece of glass in an article of clothing, and I looked at it and it was a small piece of glass of the same kind. At three or four other times more came. I suppose it has been a year ago since the last piece came, it continued for about a year. . . I think it was about the last of April this glass came from my womb. . . . I was in bed and I proceeded to tell Dr. Dewar and Dr. Royster about *Page 388 
my complaint, and exhibited to them the piece of glass which came from my womb. Dr. Dewar broke the glass; I don't remember what he used, he laid the glass down on the table and pecked off the end, and I do not know whether he did that with his thumb or knife. I did not pay any attention to what he did it with. I don't remember how much he crushed off but my first impression of the piece of glass was that it was almost an inch long, and it was about one-half inch long when he handed it back to me."
Ralph Pendergraft, the husband of plaintiff, testified, in part: "I know about this piece of glass my wife testified about. I was in the living room on Sunday night and my wife had gone to bed, and I was reading, and it was probably between eight and nine; it might have been a little later than nine, I am not positive, and I heard her sobbing, and I went in and she said she was worried, that she had passed a piece of glass that afternoon, and she showed it to me, and I went to the phone and called Dr. Royster right then. I told him that I wanted him to come to my house immediately and he said `what is the matter,' and I said `my wife has passed a piece of glass,' and he said `that is a case for your family physician, Dr. Dewar, and not for the surgeon,' and then I told him that it came from the place where he operated on and he said `where,' and then I told him that I rather not tell him over the phone, and he said he would come right then and he came in about an hour and Dr. Dewar was with him. When they came in they asked me what was the trouble and I told them that she had found this piece of glass around the mouth of the womb. I think it was about an inch long. It was rounded on the bottom, and it was part of a glass tube, and the end tapered like a tube, I mean like a pen point. . . . Dr. Royster came in and Dr. Dewar was with him, and sat down by the bed. Dr. Royster spoke to her and asked her how she was feeling, and she told him and he asked to make an examination and she let him make the examination, and Dr. Dewar said it was impossible to pass that piece of glass that way, and Mrs. Pendergraft said she took it out of the mouth of her womb, and he said `You could not, you could not touch the mouth of your womb,' that it is impossible, and Dr. Royster said `I guess she could' and he says that she knows her anatomy pretty well, and Dr. Royster said `Let's see the piece of glass,' and Dr. Dewar took it and said `I believe it is glass,' and he said it looked like a piece of capsule at first, and he sat down and started to break it up with some instrument, picked the edge off, and I was on the other side of the bed, and Mrs. Pendergraft reached over and got it and I put it in a little box and put it on the dresser. . . . The piece of glass my wife showed me had evidence of blood on it; there was pus like on the inside and *Page 389 
there was a streak of blood across it. I did not wash it off, it was there when Dr. Royster saw it. That is what I took and delivered to Mr. Hinsdale; he has it. My wife passed four or five pieces after that, possibly more; I think she passed it over a period of 12 months, after April, 1929."
The plaintiff alleged "that she was injured by the grossly careless and negligent manner in which defendant performed said operation upon her, in that he carelessly and negligently, after said operation, left in her body a glass drainage tube which has become broken, or at the time of dressing her wound carelessly and negligently used gauze packing which had imbedded in it broken pieces of glass tube which upon the removal of the packing, was carelessly and negligently allowed to remain in her body."
The defendant denied these allegations. The defendant, in regard to the glass drainage tube and glass, testified, in part: "I used irrigation of tincture of iodine diluted with water. There is a large can of about two quarts suspended, and there is a long rubber tube, and there is a nozzle, and that is used for washing out — when you are operating you wash out any discharge. That can is usually a large glass can, top open and narrowed toward the bottom, to which is attached this long rubber tube. It has a glass nozzle which is attached to the end of the rubber tube, and it comes to a very fine point so as to wash in and out small pieces. This is exactly the type I used at that time. (Witness has nozzle in hands.) This is attached to the tube. There is a clasp that you cut the water on and off with, and that was used in and around the neck of the womb by pulling it down. During the operation and irrigation I had that in my hands all the time; no portion of it broke. . . . The gauze I put in was in strips about two inches wide, and I suppose one yard long, and we sometimes used two or one and the strip to the cervix is possibly half an inch wide. This is opened in the operating room, and it is kept on a separate table and used only for that purpose, vaginal packs. The gauze is prepared by the operating room nurses and wrapped up and opened at the time; it is sterile. The gauze is handled by my assistant and myself. There was not any glass or any portion of the glass in the gauze which I used. (Cross-examination.) If I had put the glass nozzle and the curetting instrument in it would have been possible for me to have struck them. I never broke one. I don't think I made any special examination of it after the operation. There are many things possible, but I know that I did not break it. I cannot account for the glass being in there. The neck of the womb was torn sideways. The womb is entered through the cervix, and the mouth is a small opening which we dilate, and the cervix protrudes *Page 390 
to the vagina. It varies from one inch to three inches depending upon the architecture of the patient. I should say in this patient it was one or one and a half inches. . . . Cat gut comes in a little bottle sealed up. It is broken before the operation is started, and it is done by the nurses. It is usually done half an hour or an hour before. If you take this cat gut out an hour before the operation it would be sterile; you put it between two sterile towels and wrap it up. A tube is broken right there sometimes when you need an extra supply. When I go in there to perform an operation the nurse had the sterilized gauze. The tube is never broken around or near where the vagina packing is done, and it is done on an entirely different table in the opposite side of the room. When you need an extra one it is done there but at a different table. It is not probable that when this glass was broken in the piece of gauze that that piece of gauze was used to pack with, and I would say it was impossible. Any man in the world in straightening it out would see whether there was any glass in it and he would not put it in the womb. . . . These tubes Mr. Hinsdale asked about and broke one for the jury contain cat gut. They are broken by the nurse between two gauzes or towels."
Dr. George Wright an expert witness for defendant, testified, in part: "The tube which contains this cat gut varies in size, and it is medically sealed so no air can get in there, and it contains the cat gut and the preservation fluid: and a center line has been formed around it so as to facilitate the breaking of the tube. The table where these tubes are broken is some five to seven feet from the table containing the sponges or the surgeon's table. After that tube is broken the piece of gauze that contained the glass particles of the tube is put in the waste basket. No part is put back on the operating table to be used by the doctor. No gauze was used in this operation by Dr. Royster in which a piece of glass had been broken."
Dr. A. S. Oliver, an expert witness for defendant testified, in part: "I know Dr. H. A. Royster. I have known him probably 20 years. I know his general character; it is excellent. He is considered one of the best in the medical profession in the South. . . . I am familiar with the surgical operation on the womb known as curetting; and also in the laceration of the vagina. I heard the statement of Dr. Royster as to the manner in which this operation was performed upon the plaintiff in this case. That operation was performed in the usual, ordinary and customary manner as similar operations are performed by surgeons generally. That is the usual and acceptable manner in which it is performed. The irrigation referred to by Dr. Royster through a glass nozzle is the usual and ordinary manner. It is the general acceptable manner, *Page 391 
and in general use. If the jury should find from the evidence in this case that on 24 January, 1929, Dr. Royster performed an operation upon this plaintiff and removed her appendix, curetted her womb, and sewed up certain lacerations of her vagina, and that she remained in the hospital for about 2 weeks, gradually improving in her condition, and that thereafter she went to her home, and from the period of 24 January, 1929, up until 27 or 28 April, her menstruation periods were regular, and there was no spotting, and her menstruation periods were normal, and she had but little leucorrhea, and but very little pain at intervals, and that thereafter on 28 April, after the operation in January, she removed from the neck of her womb a piece of glass from one-half to one inch in length, a jagged piece of glass, I have an opinion satisfactory to myself as to whether that piece of glass could have been embedded in her womb over that period of time under those conditions. My opinion is it could not under those circumstances have been there. You mean could the average woman remove from the neck of her womb a piece of glass from one-half to one inch in length by the use of two of her fingers — I have an opinion that the average woman could not do that — I mean remove the piece of glass with her fingers."
It was in evidence that the cat gut came in small sealed glass tubes, these are usually broken and the cat gut prepared before the operation, sometimes glass tubes are broken during the operation, when the cat gut runs out. A tube was broken before the jury and Mrs. Pendergraft selected a piece of this broken tube that she testified corresponded very closely to the piece of glass that came out of her womb. She testified "It looks as though it might have been the identical piece." It was further in evidence that in this particular case neither the defendant nor any of his witnesses saw the tubes broken before the operation, but that they testified from the general method used in such cases. "The usual custom for inserting the gauze packing in the vagina is for the nurse to hand you the gauze and you open it with the forceps and just slip it in. The assistant often times takes the gauze and has it ready, and hands it to the surgeon, as a rule it is the assistant's job to furnish the instruments and sponges. I think that it is the duty of the surgeon to see that it is in proper form."
The issues of negligence and damage were answered in favor of plaintiff. Judgment was rendered on the verdict. The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court.
The questions involved in this appeal: (1) Did the trial court commit error in refusing to sustain defendant's motion as of nonsuit at the close of plaintiff's evidence and at the close of all of the evidence? C. S., 567. (2) Did the trial court commit error in its charge to the jury, as is set forth in the assignments of error, upon the doctrine of res ipsaloquitur? We think both questions must be answered in the negative.
In the case of Nash v. Royster, 189 N.C. at p. 415, the court below charged the jury: "The court charges you that upon the employment of a physician or surgeon for treatment of a patient, there is an implied contract that the physician will use all known and reasonable means to accomplish the object for which he is called to treat the patient, and that he will attend the patient carefully and diligently; and that is no guaranty that he will cure the patient or that he will not commit an error of judgment."
On this aspect of the case, this Court said, at p. 416, citing numerous authorities: "A physician or surgeon is not required to use `all known andreasonable means' to accomplish the object for which he is employed, unless by specific contract he obligates himself to do so.'" In this same case,Stacy, C. J., in an able and well considered opinion, citing numerous authorities, said at pp. 413-414: "Ordinarily, when a physician or surgeon undertakes to treat a patient without any special arrangement or agreement, his engagement implies three things: (1) that he possesses the requisite degree of learning, skill and ability necessary to the practice of his profession, and which others similarly situated, ordinarily possess; (2) that he will exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to the patient's case; and (3) that he will exert his best judgment in the treatment and care of the case entrusted to him." Pangle v. Appalachian Hall, 190 N.C. 833;Covington v. Wyatt, 196 N.C. 367; Johnson v. Hospital, 196 N.C. 610;Smith v. Wharton, 199 N.C. 246; Penland v. Hospital, 199 N.C. 314;Childers v. Frye, 201 N.C. 42; Ferguson v. Glenn, 201 N.C. 128;Bowditch v. French Broad Hospital, 201 N.C. 168; Smith v. McClung,201 N.C. 648; Gosnell v. R. R., 202 N.C. 234; Byrd v.Hospital, 202 N.C. 337.
In Smith v. McClung, supra, at p. 651, Brogden, J., says: "Hence, if the principle of res ipsa loquitur does not apply, the case should have been nonsuited. . . . These cases do not deny the application of the principle where the facts warrant it, but merely hold that the facts of the particular cases do not justify the application.
In McLeod v. Hicks, ante, at p. 134, the observation is made by the same learned judge, "It cannot be said as a matter of law that a layman *Page 393 
cannot testify as to the location of a knife incision or wound upon the exterior of the body or that such testimony should not be entitled to the same weight as that of an expert witness." This principle is sustained by almost the unanimous holdings of the courts.
We think the principle well stated and digested in Medical Jurisprudence (Herzog), (1931), sec. 187 p. 162-3: "The doctrine of res ipsa loquitur, that negligence need not be proved where the act causing the injury is such that negligence would necessarily be inferred, has been applied in a few malpractice cases; but generally the plaintiff is required to point out wherein the defendant was negligent, even though it is obvious that the results of the treatment was harmful. In a Kentucky case the defendant had treated the plaintiff for `trench mouth' by injecting salvarsan into his arm. There was no evidence to show that this was an improper method of treatment, or that the defendant had administered it in a negligent manner. Therefore the court held him not liable, saying that harmful results may follow when a powerful and dangerous drug is used even though the physician proceeds with the utmost care and skill. In many other cases it has been held that mere proof of a mistake or poor results does not itself prove malpractice, but where the injury is received while the patient isunconscious, the doctrine commonly is held to apply because under suchcircumstances the patient would not be able to testify as to what hadhappened, whereas the physician could. (Italics ours.) It is also frequently applied in actions to recover damages for X-ray burns." The author is editor of the Medico-Legal Journal, and therefore well qualified to write on the subject.
The general rule is to the effect that there is in malpractice actions no presumption of negligence from error of judgment in the diagnosis by a doctor of the patient's illness, or in the treatment prescribed in the failure to successfully effect a remedy or to accomplish as good results as some one else might have done. A doctor is neither a warrantor of cures nor an insurer.
"There is, however, a well-recognized exception to the above rules, `where there is manifest such obvious gross want of care and skill as to afford, of itself, an almost conclusive inference' of negligence (Simak v.Foster, 106 Conn. 366; Donahoo v. Lovas, 288 P. 698). In such cases, neither affirmative proof of negligence, nor expert testimony as to want of skill, need be given by the plaintiff. This presumption of negligence from certain proven facts, otherwise known as the doctrine of res ipsa loquitur, has been frequently applied, in actions for malpractice, to cases where the surgeon has left a foreign substance, such as sponges or gauze, in the patient's body after an operation. The distinction *Page 394 
between the application of the general rule, and of the exception, is tersely pointed out in Evans v. Roberts, 172 Iowa 653, where it appeared that a surgeon, in removing adenoids, had injured surrounding healthy tissue. The Court said: `If a surgeon, undertaking to remove a tumor from a person's scalp, lets his knife slip and cuts off his patient's ear, or if he undertakes to stitch a wound on the patient's cheek, and by an awkward move thrusts his needle into the patient's eye, or if a dentist, in his haste, leaves a decayed tooth in the jaw of his patient and removes one which is perfectly sound and serviceable, the charitable presumptions, which ordinarily protect the pactitioner [practitioner] against legal blame where his treatment is unsuccessful, are not here available.'" U.S. Law Review (Nov., 1930), at p. 610. Moore v. Steen et al., 283 Pac. (Cal.), 833. Quillen v. Skaggs (Ky.), 25 S.W. (2d series, 1930), 33; Brown v.Shortlidge, 277 P. 134 (Cal.); McCormick v. Jones, 152 Wn. 508,278 P. 181.
"The maxim res ipsa loquitur applies in many cases, for the affair speaks for itself. It is not that in any case negligence can be assumed from the mere fact of an accident and an injury, but in these cases the surrounding circumstances which are necessarily brought into view, by showing how the accident occurred, contain without further proof sufficient evidence of the defendant's duty and of his neglect to perform it. The fact of the casualty and the attendant circumstances may themselves furnish all the proof that the injured person is able to offer or that it is necessary to offer." Sh. and Redf. on Negl., sec. 59. Womble v. Grocery Co.,135 N.C. 474; Ridge v. R. R., 167 N.C. at p. 518; O'Brien v.Parks-Cramer Co., 196 N.C. at pp. 365-6; Springs v. Doll, 197 N.C. 240.
In 65 A.L.R., p. 1028, citing cases from Alabama, Indiana, Iowa, Kentucky, Minnesota, Missouri, Nebraska, Ohio, and Washington, we find: "It is generally held that it is a proper question for the jury to determine whether the leaving of a sponge or foreign substance in a wound is negligence on the part of the defendant."
In Reynolds v. Smith, 148 Iowa 264, 127 N.W. 192; "the plaintiff was allowed to recover for the negligence of the defendants in leaving a piece of gauze in her abdominal cavity. The defendants requested instructions to the effect that all exacted of them was that they follow the customs and usages of physicians in the vicinity where they practiced. The Court said: `They were rightly refused, for no evidence was adduced that any particular custom or usage in the matter of avoiding leaving the gauze in plaintiff was actually followed. Moreover, if there has been such evidence, these instructions ought not to have been given, for, in view of the failure of the wound to heal, to continuance of suppuration, *Page 395 
together with the significance of leaving such a substance in the body, the issue of negligence must have been submitted to the jury." 65 A.L.R.,supra.
In Baer v. Chowning, 135 Minn. 453, 161 N.W. 144, another abdominal operation, a gauze pack or sponge and a portion of a rubber drainage tubethat had been used by the defendant were left by him in plaintiff'sabdominal cavity. The Court held that that testimony made the question of the defendant's negligence for the jury. To the same effect, see Sellers v.Noah, 209 Ala. 103, 95 So. 167. 65 A.L.R., supra.
"There are some authorities that uphold the view that the failure of the surgeon to remove a sponge or other foreign substance from an incision constitutes negligence per se." 65 A.L.R., supra, at p. 1030.
It is the settled rule of practice and the accepted position in this jurisdiction that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support her cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and she is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.
Plaintiff's testimony, corroborated by her husband, was to the effect that a jagged piece of glass, almost an inch long, which was rounded and looked like it had been part of a tube, about three months after the operation, she took from the mouth of her womb. "I kept working it more and more and it went back so far I could not touch it at all, and then again I sat down in the same position and strained myself, and I worked at it until it slipped out in my hand." Notice was given defendant at once of this occurrence. Plaintiff further testified that thereafter she passed some small pieces of glass three or four times over a period of twelve months.
The evidence was to the effect that glass similar to that which the plaintiff alleged she took from her womb was used in the operation by defendant and placed in her parts — irrigation through a glass nozzle. Then again, a glass tube contains the cat gut used and the glass tube is broken to get it out. "After that tube is broken the piece of gauze that contained the glass particles of the tube is put in the waste basket." "They are broken by the nurse between two gauzes or towels." "The usual custom for inserting the gauze packing in the vagina is for the nurse to hand you (the surgeon) the gauze and you open it with the forceps, and just slip it in." *Page 396 
We think the direct and circumstantial evidence sufficient to be submitted to the jury. Speas v. Bank, 188 N.C. 529; Eaker v.International Shoe Co., 199 N.C. pp. 383-4. In Hutchins v. Taylor-BuickCo., 198 N.C. at p. 779, it is held: "A prima facie showing carries the case to the jury."
In Bryant v. Construction Co., 197 N.C. at p. 643, Adams, J., says: "In some of our decisions the expressions res ipsa loquitur, prima facie evidence, prima facie case, and presumption of negligence have been used as practically synonymous. As thus used, each expression signifies nothing more than evidence to be considered by the jury."
In operations like the present, the patient is unconscious from the administration of anesthetics. If the principle of res ipsa loquitur did not apply in an action like the present, the patient would be remediless. The court below in charging the jury took the law copiously from the Nashcase, supra. The defendant contends that the court below in its charge overlooked the fact that the alleged injury to plaintiff, caused by the glass in the wound, was denied as existing and therefore to sustain the principle of res ipsa loquitur the plaintiff had to prove same.
We think the judge's charge, and the theory upon which the action was tried in the court below, sufficient to meet defendant's objection and it cannot be sustained.
As to res ipsa loquitur, the court below charged the jury correctly as follows: "Where a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen, if those who have control and management of it use the proper care, it furnishes or would be some evidence, in the absence of explanation of the defendant that the accident arose from want of care. The principle of res ipsa loquitur (which means the thing speaks for itself) in such cases carries the question of negligence to the jury, not, however, relieving the plaintiff of the burden of proof, and not raising any presumption in her favor, but simply entitles the jury in view of all the circumstances and conditions as shown by the plaintiff's evidence to infer negligence and say whether upon all the evidence the plaintiff has sustained her allegation. The plaintiff upon all the evidence must satisfy the jury by the greater weight of the evidence that the defendant was negligent, and that such negligence was the proximate cause of plaintiff's injury as alleged by plaintiff."
The defendant contended in his brief: "In this case it was incumbent upon the plaintiff to show by evidence, either direct or circumstantial, first, that her injury, if any, occurred through some agency or instrumentality under defendant's control; and, second, that in the use of *Page 397 
such agency or instrumentality the defendant was guilty of negligence, in that he did not exercise his best judgment, ordinary care and skill, as is usually done in such cases of surgeons."
We think the following portion of the charge of the court below meets the very contention: "If the plaintiff has failed to satisfy you by the greater weight of the evidence that glass was in the plaintiff's body incident to the operation, it would be your duty to answer the first issue No. Even if you should find that some glass was found in her body two or three months after the operation, but that the plaintiff has failed to satisfy you by the greater weight of the evidence that the defendant failed to exert his best judgment, skill and ability, then it would be your duty to answer the first issue No."
Under the facts and circumstances of this case, we think the above charge as favorable to defendant as could be asked for under the authorities.
The physician has been of untold value to the human race. Without them pestilence and famine would walk hand in hand on this earth. Health is wealth. The priceless boon of modern medicine and surgery in the last third of a century has added untold blessings to the human family, and longevity of life. The achievements of medicine and surgery are too numerous to mention here and far be it that the courts should put a stumbling block in the way of these communal and humanitarian efforts. It has become a veritable cornerstone of our civilization, and without science of medicine and surgery our structure would crumble. Science now has control of pain by the use of anesthetics. It was the eminent Georgia physician, Dr. Crawford W. Long, who is credited with the initial discovery of this blessing to the human family, in consequence of which pain in surgery has been diminished and science controlling pain. In recognition of his work, the Georgia Legislature erected his statute in the hall of statuary, Washington, D.C. It is written in medical works that in regard to the discovery of anesthesia Dr. Long was, without doubt, the first to make use of the condition, producing it intentionally after deliberate calculations. The principle set forth by Dr. Herzog in his Medical Jurisprudence, supra, is to the effect that where the injury is received while the patient is unconscious the doctrine of res ipsa loquitur is applicable.
The defendant and his witnesses, expert and otherwise, contend that the injury could not have occurred as alleged by plaintiff. This, we think, is a fact to be determined by a jury. We think the evidence sufficient to have been submitted to the jury; they, and not we, are the triers of the disputed facts. This Court on appeal to it can only review "any decision of the courts below, upon any matter of law or legal inference." *Page 398 
Constitution of North Carolina, Art. IV, part sec. 8. From the record the court below tried the case with care, according to the authorities in this and other jurisdictions. The jury has found for the plaintiff. In law we find
No error.