This is a suit brought in behalf of the infant plaintiff to recover damages for a personal injury alleged to have been caused by the negligence and malpractice of the defendant, a practicing physician, while under his care as a patient. Under proper pleadings, and taken in the most favorable light to the plaintiff, the evidence tends to show that plaintiff, then twelve years of age and in the sixth grade, sustained a simple fracture of both bones of the right leg, some distance below the knee, caused by a log of timber falling upon it. The skin was not broken. She was carried to Dr. Lupton's Hospital in Burlington and there placed under his care. An X-ray picture was taken to the leg, at which time, in the language of the witness, "it was not hurting me much." The doctor bandaged it and put her to bed. We quote:
"Saturday night he took me in the X-ray room and set the big bone in my leg. It was not hurting me and was not swollen. He did not do anything on Sunday and my leg was not swollen or hurting me. About one-thirty on Monday afternoon he put a thin bandage on my leg and put a plaster cast from above my knee to where the break occurred, and there left an open space, and below the break put a cast on down on my foot. My leg was not swollen then. He did not do anything to my leg on Tuesday. On Wednesday afternoon about five o'clock he put a brace consisting of two iron rods down the side and two iron rings and then he had something to make it tight. He worked the screws with a wrench to tighten them. My leg was not paining me until he tightened them screws and it was not swollen. He kept coming back and tightening them. I was hurting so bad I kept crying and he would not do anything, just kept on tightening them — he did not say anything. That night he took me in the X-ray room and looked at my leg and tightened the screws some more. My leg kept hurting and swelling — I cried, but not out loud, the nurses were holding me, and gave me little pills. He took the brace off and filled in the empty space with plaster cast. I slept all next morning and saw Dr. Lupton when I awoke late that *Page 655 
afternoon between four and five o'clock. When I woke I could feel no pain at all. I looked at my toes and they were swollen and black spotted. Dr. Lupton came in and took me home about six o'clock. My leg began hurting about seven o'clock that night. It was swelled and the cast was hurting me. We sent for Dr. Lupton and he came about nine o'clock. He split the cast from the top down a little over the break. He did not do anything to the cast on my foot below the break. My toes were swelled and black spotted. On Friday Dr. Lupton came about five o'clock. My leg was hurting me where the cast had not been split. I was not crying much. I had no feeling in it — my toes were swelled and black spotted then. He did not do anything to my leg but look at it. We sent for him again that night, as I was suffering. He came about nine o'clock and removed all the cast from my leg. My foot was swelled and black spotted. Mrs. Hughes and Mrs. Crabtree and mother were in the room. The top of my foot was black and swelled. My leg that was broken was twice the size of my other leg. Right below my knee were blisters where these scars are now. I had never had any injury to my right leg before.
"That night blisters began forming on the heel and toe of my foot where the black spots were after the cast was removed. They were forming on Saturday and Dr. Lupton saw them and he told mother that he thought that was the natural thing for my foot to be like. The blisters burst the next day and when they burst the meat started eating off. Dr. Lupton saw me Sunday, and the blisters had burst. I was in bed with my leg on a pillow and an electric light over it. I had no feeling in my leg and it was hot. I stayed there in bed until Dr. Lupton took me back to his hospital to treat me — some time in December near Christmas. My foot was resting on a pillow and every night a violet ray lamp was put over my foot. The heel of my foot came off while I was there in his hospital. I was brought home again some time in February, 1937. The front of my foot was better. Dr. Lupton would come and dress it. One day he came and put it on the floor and mashed it. He said he thought maybe it would straighten it up, it was stiff. It started bleeding and abscesses started. This happened after I had been home a little over a month. In March I went back to Dr. Lupton's hospital and stayed there eleven weeks. My foot was in bad condition, the sores were getting worse. No other doctor saw me while I was there in the hospital. I went to Duke Hospital then. Dr. Lupton went and was there when some bones were taken from my foot. I stayed there ten days. A cast was put on my leg and I went back every month to have the cast changed. My foot was operated on at Duke Hospital twice. Dr. Lupton was present both times. My foot did not heal then. My foot was normal before the iron brace and traction was put on it, *Page 656 
and no difference in size from my left foot. I do not have much feeling in it now."
This evidence was corroborated by Mrs. L. T. Jones, her mother by an earlier marriage, as follows:
Francis Butler is my daughter by my first husband. On October 23, 1936, she broke her leg. We had some sills — 8' x 8' and 16 feet long three feet high in the back yard. She had been seesawing on this end of the long and one end fell 16 inches, the end did not fall off, and the corner hit her leg and broke it. She called me and was sitting on the ground, the log was up against her, and I just lifted it off and took her to Dr. Lupton's office. I went back Saturday morning at nine-thirty o'clock and Dr. Lupton said it was broken. There was just a little blue place on her right leg. There was no break or cut on the skin or bruise on the foot, either the heel or top of the foot. I stayed with her until nine-thirty that night and she was not complaining of any pain that day. He had the leg bandaged, but the toes and foot looked natural. I went back Sunday and stayed all afternoon and she was not complaining of any pain. I went back again Monday afternoon and Dr. Lupton told me he had set the big bone but the little bone was off just a little bit. Francis did not seem to be suffering any pain more than kind of nervous. I did not see the cast put on this day. I went back on Tuesday afternoon and she did not complain of any pain Tuesday. I went back Wednesday afternoon and Dr. Lupton told me he was putting an iron brace on her leg. It was two iron rings, one went here below the break and one above the break. He put two iron rods, one on each side, and two screws on each end and had a pair of pliers. This was around five o'clock, and when I left at six o'clock he was beginning to turn these little taps (screws) and she was beginning to suffer and cry out before I left — asked me not to leave — and he told me to go on, that he thought he would bring her home at nine o'clock, but did not bring her until the next day at five o'clock p.m. She had not complained of any pain before he began to apply this extension or brace on her leg. I did not go back on Thursday as I was waiting every minute for him to bring her home.
"When Dr. Lupton brought her next day she was half asleep. I tried to talk to her, but she did not talk normally. She could not see well enough to tell who the children were that came in to see her. Dr. Lupton said he thought she would be all right, to go ahead and play the radio or anything. He said to keep something hot on her leg. The braces were not on her leg when he brought her home and the cast had been filled in between the other two casts at the break. He gave me a prescription for some medicine to make her sleep. She did not sleep any Thursday night at all. She complained of her foot burning and wanted *Page 657 
something cold on it. Dr. Lupton said apply something hot. I put towels and a hot water bottle the best I could. I called Dr. Lupton that night (Thursday) about seven o'clock and told him her foot was swollen — was burning her up — I asked him if it was natural for it to be like that — that her toes and foot were cold and black spotted, and he said it was, it was perfectly natural. He came and split the cast from the top to somewhere near the ankle and put pieces of pasteboard in there to hold it open. I mentioned the discoloration of the toes and foot to him, he looked at it, but did not say anything. He did not split the cast all the way. She did not rest any that night. Dr. Lupton came Friday morning and looked at her leg. He did not do anything. The toes were turning dark with black spots on them. Francis was complaining of her foot while he was there. I was still giving her the medicine doctor said was to make her sleep. I got this medicine on Thursday and had it when doctor came at seven o'clock that night. He told me to give her a teaspoon when he gave me the prescription but when he came back he said to give her two teaspoonsful. I did this for two days, until I gave it all to her.
"Dr. Lupton came back late Friday afternoon. I did not send for him. Her toes were discolored the same as that morning. Dr. Lupton did not say much of anything. He sat at the foot of the bed and rubbed her toes and the top of her foot, and I asked him if he did not think it would be best to take all that off (cast) and he said no, that would be all right. Her toes were cold then. I called Dr. Lupton that night three times and he came around nine o'clock that night. She was suffering and crying for him to take it off (cast).
"Her foot and toes were purple and black spotted. Mrs. Ben Hughes and Mrs. J. W. Crabtree were there when Dr. Lupton came in. This was Friday night one week after her injury. Mrs. Crabtree, Mrs. Hughes and myself had been trying to hold the cast open, the part that had been cut the night before, as it was pinching her so she couldn't hardly stand it. Dr. Lupton split the rest of the cast and took it all off. He split it with a little knife and removed the whole cast. There was a little thin bandage of gauze on the inside of the cast. I looked at Francis' leg and it was twice the size of her left leg. Her knee and all was swollen and there was a raw place right below the knee. The top of her foot was black and the heel was black, and the toes were purple with black spots. Dr. Lupton did not say anything to me about the condition for her leg. He put an electric light on it and told me when he got ready to go we would see a big difference in it by Monday. I asked him about carrying her to a hospital and whether it would be better to have a nurse, and he said no. The next I noticed was that blisters began to rise below the knee and on top of her foot and heel *Page 658 
where the black places were, this was on Saturday. Dr. Lupton came that morning. I kept her flat on her back with her leg and foot on a pillow for about two weeks. She did not have a cast on her leg. Dr. Lupton came again Saturday night, and the condition of her foot was the same. He rubbed her toes and the part of her foot that was not black. I don't know whether any of the blisters had broken that night exactly, but I know they would rise and break, and some Dr. Lupton would have to open and let the black blood run out. The next that developed was that the skin came off the foot, her toe nails came off, and then it began to eat and look green. He kept it painted with some kind of pink looking medicine that would paint over and you could not see the under side, and this eating of her flesh would break through, and he told me to take a piece of cotton and keep it painted over. This eating started where the blisters would burst all over her foot. Dr. Lupton came at least twice a day and did not have much to say. His treatment was different things. After we kept using this painting medicine, and I had kinda pulled the flesh back on her foot with a piece of cotton, I called him, and he told me to put hot salts applications on it, which I did as long as he told me, every hour day and night. My husband and myself sat by her bed six weeks, day and night. Dr. Lupton said he would rather have me attend her than to carry her to a hospital, said she would get better treatment. On December 10th he said he wanted to carry her back to his place and use a violet ray light on her. She stayed at his hospital until Christmas Eve night, when he brought her home, and we carried her back on Christmas Day. Dr. Lupton went to Florida and stayed ten days. His nurse gave her violet ray treatments and dressed her foot every day. I went every night to Dr. Lupton's hospital, and he dressed the foot at times when I was there and he would tell me how much better it looked and was getting. I observed that the whole part of her heel had come off and there was a raw place on top of her foot and big toe. She stayed in Dr. Lupton's hospital until the second week in February, 1937. He told me that she was getting better. Her foot was stiff and all her toes were drawn down. Dr. Lupton came and put codliver oil on the wounds and dressed them. The toes all improved but the big toe. She stayed at home until around the 25th of March, 1937, and while she was home doctor came about every other night. He told me he was taking her back to the hospital because the abscesses had formed on her foot. He would dress it when I was there, was using some kind of salve on the top to grow skin and was irrigating it with a kind of glass pump with medicine in it. Her foot had holes in it and he would put the medicine through her toes and fill the top of her foot and it would run out through her heel. On Tuesday, June 8th, Dr. Lupton, my husband and myself took her to Duke Hospital for *Page 659 
examination. I suggested taking her to Duke to Dr. Lupton and he said we had better let well enough alone, if I didn't she might lose her foot — the first time he had ever told me anything like that. He had always told me before that it was getting along fine, all right, and she would come home in a few days. On June 14th she was entered at Duke Hospital and was operated on the 15th. Dr. Lupton was there and Dr. Shands did the operating. She stayed ten days and I went down every night. She was brought back to her home on June 25th, and had a plaster cast on her entire leg up to above her knee. There was no extension on it. The first cast was removed at Duke Hospital in about two weeks. Dr. Lupton was there when it was removed and what I could see of it the whole foot almost was gone, the top of the whole foot. I could not see the heel the way she was lying. Another plaster cast was put on and she was brought home. This cast stayed on for about three or four weeks and was taken off at Duke Hospital. Dr. Lupton was there. Another cast was put on but I don't remember exactly how long that stayed on, but when they took it off and left it off it was the last of August, 1937. Dr. Lupton was there then and the condition of the foot on the whole top part was still bad, the heel was off. Dr. Lupton continued to come to see her for two or three times. He would come in and look at her foot. That was all there was to do. Dr. Lupton would carry her to Duke at least once a month to have her foot dressed, until February, 1938. He would dress it the other times at home. Along in January, 1938, Dr. Lupton told me he was going to have a little more work done on her foot. At Christmas they had taken X-rays and Dr. Lupton told me that there was no infection in the bone at that time. This was at Christmas, and along in January he told me he was going to have the bone scraped out, so we carried her back in February and she stayed in Duke Hospital one week and was then brought home. I dismissed Dr. Lupton the day we brought her from Duke and he has not seen her foot since then.
"I do not know of any consultation that Dr. Lupton had with any other physician from the time Francis went to his hospital in December, 1936, until I suggested taking her to Duke in June, 1937. Before he took her to his hospital in December, 1936, we told him to bring Dr. Bell to look at it and we still were not satisfied about it so we called him to bring Dr. Moore. He brought those two doctors. They talked but did not tell us anything. This was some time between October 23rd and December 10, 1936. There was no difference in the condition of her foot at the time Dr. Moore came than when Dr. Bell came. The flesh was eaten off and the toes were dark. Dr. Moore looked at her foot and told us something about it being in a bad fix. Before this injury she was not nervous at all and her health was all right. She had never had *Page 660 
any fracture before this occurrence on October 23, 1936. Both her legs were alike before this injury. After her injury and the treatment she received from the defendant she could not go to school for two years and was nervous. She is a lot better now. She has been going to school since October, 1938, walking on her crutches and sleeps all right. When I first took Francis to Dr. Lupton on October 23, 1936, he said: "She will be all right in a little while, a few weeks or a few days."
Dr. L. S. Booker, a witness for the plaintiff, and an admitted expert surgeon and physician, testified that he had examined the right leg of this plaintiff on the day before the trial and found just below the knee an old scar which was the result of a healed wound. The foot and leg showed that there had been extensive destruction of both the soft and bony tissues of the foot, evidence of both on top of and on the heel of the foot, and there is present ulceration and evidence of necrosis of both soft and bony tissues — in other words, "evidence of dead bone in the right foot." Witness was of the opinion that the condition was caused by interference with the circulation in the leg and foot.
Witness testified that the object in putting a ring around a plaster cast and another ring around another plaster cast, not joined together, and a brace on the side and set screws, and screwing those screws down or up is to produce "extension of the limb." Thus, two fixed points are provided, and, between the two points, necessary extension can be applied. Such extension in fractures is used for overcoming the muscle pull which tends to shorten the bones where they are broken, and to adjust broken ends of the bone. That a plaster cast was applied to the plaintiff's limb, one above the break, in order to produce such extension, and the screws were tightened so that the plaster cast above the break was pushed upward and the one below the break downward. This would necessarily produce pressure above the pressure below. "The pressure of the upper plaster cast would be against the bony structure just below the knee, and the pressure of the lower cast would be upon the top or dorsum of the foot and the heel behind. My opinion is that the scar which she presents now was due to pressure from a plaster cast, which is just below the knee on her right leg, that that amount of pressure necessary to produce that scar would have interfered with the circulation of the whole leg."
"The usual and accepted treatment of physicians and surgeons in this locality with reference to simple fracture of the leg is first to make the patient comfortable and either reduce the fracture immediately or to defer it for several days, and after the fracture of the bone or bones has been reduced, some fixation apparatus, either splint or plaster cast, is usually applied to these breaks.
"If within eight or ten hours or more after the plaster cast and *Page 661 
extension apparatus was applied to Francis Butler's leg the toes turned spotted and black and the foot cold, that would indicate interference with the circulation in that leg. If Dr. Lupton's attention was called to the fact that black spots on the child's foot were present and that the foot was cold by the mother of the child, the accepted treatment of physicians and surgeons in this locality would have been removal of the entire cast immediately or loosened, one of the two, and elevation of the foot.
"The failure to remove something that is interfering with the circulation of the blood to the extent of causing the foot to turn black and discolor and become cold, would be a certain amount of death and destruction of tissues to the point affected. If upon the removal of the cast on Friday night by Dr. Lupton there appeared upon the top of the foot of Francis Butler a black spot and on the heel a black spot, my opinion is that the condition showed the beginning of gangrene. Gangrene is destruction or death of tissue, either the soft tissue such as skin, muscle, nerves, or the solid tissues such as bone. There are two general kinds of gangrene, dry gangrene, which is seen in elderly people, and which always occurs when the total complete circulation is severed or cut off from a part, and in certain cases of what we know as diabetes that gangrene is due to a complete severance of the circulation of that particular part. Moist gangrene or necrosis is a slower process, which is a result of a slower process of cutting off the circulation to the particular part of the body. The result in the end of both dry and moist gangrene is the same, but one is a more rapid process and the other a slower.
"Francis Butler has had and still has a gangrenous condition of the right foot, in other words, she has dead bone and affected condition with considerable dead bone in her foot at the present time. I think the foot will gradually get worse rather than better. The process will usually wind up in complete destruction of the part affected."
"I have an opinion as to how long it would take for gangrenous condition to develop after sufficient pressure has been produced on a limb, as shown by the limb of the plaintiff, to cut off pressure circulation. It is a well accepted fact that if complete circulation is cut off as long as eight hours there will be permanent destruction of the tissue to the part that has been cut off. That refers to complete obstruction, but to partial obstruction where it is not completely cut off the time for gangrenous condition, which is a death of tissue, is longer, depending upon, of course, the proportionate amount of circulation which is cut off. I mean by that, if you apply a tourniquet, such as a rubber band around your arm and leave it there eight hours tight enough to cut off circulation that long, you get permanent destruction of the tissues. If it is removed in two or three hours there is no damage to the forearm. When there is *Page 662 
gradual cutting off of the circulation, depending upon the amount of obstruction, you have this resulting gangrene to the part supplied by the blood.
"In my examination of Francis Butler's leg of yesterday there was apparently a good union between the fractures. The turning down of her toes is due to paralysis of certain muscles in the foot and contraction of the tendons which pull the toes down. My opinion as to the cause of that condition is pressure, and that brings about a condition in medicine known as Volkmann's contracture, which means a contracting of the tendons of the toes affected. It is a condition brought about by interference or blocking of the circulation to the muscles and tendons affected.
"If Dr. Lupton put a plaster cast on the upper and lower part of her leg, leaving a part next to the break open, and thereafter put an apparatus on her leg to push the upper part up and the lower part down, I have an opinion that its effect would cut off the circulation either completely or to a degree, I do not know of any other condition that would account for a turning down of the toes, blocking of the upper part and heel and decomposition of the foot as it later developed, except interference with the circulation of the blood to the affected foot, whether by external pressure or internal destruction or injury to the blood vessels themselves, would be the only conditions causing this condition to the foot.
"If Francis Butler had her leg broken on Friday and cast was not put on until Monday, during which time there was no swelling and no discoloration and no pain to amount to anything, and if Dr. Lupton put the pressure on those plaster casts by extension apparatus on Wednesday and on Thursday after this application was put on the toes began to show black spots, my opinion is that obstruction to the circulation was brought about by external pressure."
Dr. A. R. Shands, witness for the defendant, answered the following query as indicated: "Q. State whether or not you have an opinion satisfactory to yourself as to whether this mechanical brace used by Dr. Lupton for the purpose of holding the leg in place, as testified to by him, was proper treatment of the plaintiff at the time he used the brace. A. I would consider it a perfectly proper form of treatment to use to immobilize and hold a fracture of that type. At the time she was brought to me she had evidence by X-ray of dead bone in the lower leg and foot and I recommended that these pieces of dead bone be removed and these drainage sinuses through which pus was coming be scraped out, which was done on the 15th of June at Duke Hospital by myself." He testified that when he had examined this child she was suffering from osteomyelitis. When he examined her after her treatment by Dr. Lupton the X-ray showed a discontinuity between the ends of the leg bones. *Page 663 
Dr. George L. Carrington, witness for the defendant, in answer to hypothetical questions, testified that the treatment as described was proper and good. To the same effect was the testimony of Dr. R. M. Troxler, witness for the defendant. In answer to another hypothetical question, the testimony of Dr. H. B. Moore, witness for the defendant, was to the same effect, as was that also of Dr. Willard C. Goley, also a witness for the defendant.
At the conclusion of the plaintiff's evidence, and at the conclusion of all the evidence, the defendant moved for judgment as of nonsuit, which was allowed. Plaintiff's appeal is from this order.
Since this case comes here upon the propriety of a judgment as of nonsuit, we have not thought it necessary to extend the record by recounting defendant's evidence, although the latter is not free from inferences favorable to the plaintiff. Ford v. R. R., 209 N.C. 108,182 S.E. 717; Davidson v. Telegraph Co., 207 N.C. 790, 178 S.E. 603. It is a familiar rule that we must consider the evidence in the light most favorable to the plaintiff. Mulford v. Hotel Co., 213 N.C. 603,197 S.E. 169; Gunn v. Taxi Co., 212 N.C. 540, 193 S.E. 747; Matthews v.Cheatham, 210 N.C. 592, 188 S.E. 87; Smith v. Coach Line, 191 N.C. 589,132 S.E. 567; Leonard v. Ins. Co., 212 N.C. 151, 157,193 S.E. 166.
While we do not wish to be considered as conceding that in every case brought against a physician for malpractice plaintiff's cause must be sustained by the testimony of experts condemning the treatment received by the patient as improper (Covington v. James, 214 N.C. 71,197 S.E. 701), it is unnecessary to go into that question here, or into the applicability of the doctrine of res ipsa loquitur, so often mooted and so often questioned. Pendergraft v. Royster, 203 N.C. 384, 166 S.E. 285;Ferguson v. Glenn, 201 N.C. 128, 159 S.E. 5; Nash v. Royster, 189 N.C. 408,127 S.E. 356; Connor v. Hayworth, 206 N.C. 721, 175 S.E. 140. Such phases of the evidence as might renew the controversy on these questions may be disregarded for the purpose of the present decision. The testimony of experts brought in by the plaintiff, while maintaining the traditional reserve to be expected of professional men passing upon the efforts of others, was sufficiently condemnatory in inference and effect to carry the case to the jury. We do not intend by this to exclude from the jury any legitimate inferences which may be *Page 664 
drawn from any part of the evidence which may be permissible under the established standards of the court. Upon this evidence we refrain from comment.
The judgment is
Reversed.