JENNIFER LOVE CAMPBELL, BY AND THROUGH HER GUARDIAN AD LITEM, DUN-
CAN A. McMILLAN, MARGARET O. CAMPBELL AND JEFFREY L.
CAMPBELL v. PITT COUNTY MEMORIAL HOSPITAL, INC.

No. 863SC556

(Filed 17 February 1987)

1. Trial § 3.2— counsel unprepared for trial—denial of continuance proper

The trial court did not err in failing to grant defendant's motions for con-
tinuance where defendant argued that its counsel was unprepared for trial
because plaintiffs first informed defendant approximately one month before
trial that 22 or 23 people would be expert witnesses for plaintiffs at trial and
the burden of attending depositions in so short a time made it impossible to
prepare adequately for trial, but defendant failed to show any substantial prej-
udice to its rights by this alleged burden.

2. Physicians, Surgeons and Allied Professions § 15; Evidence § 22.1— personal
injury action against hospital—settlement of case against physician—references
properly prohibited

In a personal injury action against defendant hospital, the trial court did
not err in prohibiting any references to a physician's participation as a defend-
ant in the case when the case against him had been settled, since any such
references were properly excluded as irrelevant under N.C.G.S. § 8C-1, Rule
402 of the N.C. Rules of Evidence and as contravening the strong public policy
favoring settlement of controversies out of court.

3. Evidence § 25— personal injury action—"Day-in-the-Life" videotape—admis-
sibility

The trial court in a personal injury action did not err in admitting a "Day-
in-the-Life" videotape of the injured child where the court examined carefully
the authenticity, relevancy, and competency of the videotape, found that it was
admissible, and gave the jury proper limiting instructions at the time it was
introduced; moreover, though it would have been the better practice to pro-
vide notice to both opposing counsel and the trial court prior to taping, plain-
tiffs' failure to provide such notice here did not render the tape inadmissible.

4. Hospitals § 3.2— injury to breech baby—duties of hospital—sufficiency of evi-
dence of breach

Defendant hospital, under the doctrine of corporate negligence set forth in
Bost v. Riley, 44 N.C. App. 638, as applied to the specific facts and cir-
cumstances of the case, did have a legal duty to insure that plaintiffs' informed
consent to a vaginal delivery of a footling breech baby had been obtained prior
to delivery, and defendant also had a duty to establish an effective mechanism
for the prompt reporting of any situation which created a threat to the health
of a patient such as the minor plaintiff here; furthermore, evidence was suffi-
cient to establish defendant's liability as a corporate entity for damages
resulting from defendant's breach of these duties.

Campbell v. Pitt County Memorial Hosp.

5. **Damages § 3.4— injury to breech baby—emotional or mental distress of father —no actual physical injury shown to father**

In an action to recover for personal injuries to the minor plaintiff, the trial court erred in submitting an issue as to plaintiff father's emotional pain and suffering as the minor's parent and erred in allowing him to recover $5,000 since a plaintiff, to recover for emotional or mental distress in an ordinary negligence case, must prove that such distress was the proximate result of some physical impact with or injury to himself also resulting from defendant's negligence, and plaintiffs' evidence here showed no physical injury.

6. **Damages § 16.2; Rules of Civil Procedure § 59— injury to breech baby—medical expenses—jury verdict not set aside—no error**

In an action to recover damages resulting from a brain injury suffered by plaintiff's child during a footling breech birth, the trial court did not abuse its discretion in denying defendant's motion to set aside the jury's verdict as to the amount plaintiff father was entitled to recover where the jury awarded plaintiff $1,646,000; plaintiffs had presented evidence that the present value of the minor plaintiff's medical expenses during her minority was only $646,708; the court found this verdict excessive, unsupported by the evidence, and given under the influence of passion and prejudice; plaintiffs consented to a remittitur of $1,000,000, reducing the award to $646,000; and the court then entered judgment for this amount.

7. **Damages § 16.1; Rules of Civil Procedure § 59— injury to breech baby—excessive verdict set aside—no error**

In an action to recover damages resulting from a brain injury suffered by the minor plaintiff during a footling breech birth, the trial court did not err in setting aside the jury's award of $4,850,000 to the minor plaintiff where the court proposed a remittitur of $2,425,000 which plaintiffs declined to accept, and the court then set aside the verdict and ordered a new trial as to this issue only, finding that the jury's verdict was excessive, appeared to be given under the influence of passion and prejudice, and was unsupported by the evidence.

Judge BECTON concurring in part and dissenting in part.

Judge ORR dissenting in part.

APPEAL by plaintiffs and defendant from *Phillips, Judge.* Judgment entered 12 June 1985 in PITT County Superior Court. Heard in the Court of Appeals 18 November 1986.

Plaintiffs brought this action to recover damages for (1) personal injury to Jennifer Love Campbell, the minor child of Margaret and Jeffrey Campbell, (2) for medical expenses for Jennifer's care, (3) for loss of Jennifer's services, and (4) for mental anguish and trauma to Jennifer's parents.

The action, originally begun in Wake County on 28 April 1982, named as defendants Dr. Robert Deyton, Greenville Obstetrics and Gynecology, P.A., and Pitt County Memorial Hospital. On motion of defendants, the action was moved to Pitt County for trial. On 15 March 1985, plaintiffs entered into a settlement with Dr. Deyton and his professional association for $1,500,000.00, leaving the hospital as the sole defendant. The trial began on 18 March 1985 and came to verdict on 11 April 1985. At trial, the evidence showed, *inter alia*, the following events and circumstances:

On 30 April 1979 plaintiff Margaret Campbell was admitted to defendant Pitt County Memorial Hospital for the delivery of a child. Plaintiff Jeffrey Campbell, Mrs. Campbell's husband, accompanied her to the hospital. Shortly after Mrs. Campbell's admission, Dr. Robert Deyton, the attending obstetrician, determined that her baby was in the footling breech (feet first) presentation.

A baby can be delivered either vaginally or by Cesarean section. The presentation of the fetus is important in deciding which method is appropriate. In a prenatal visit about five weeks before the date of delivery, Mrs. Campbell was told by Dr. Richard Taft, her treating physician at that time, that her baby was then in a breech presentation and that, if the baby was still in a breech presentation when labor began, the method of delivery would be by Cesarean section.

While Dr. Deyton and the nurses assigned to monitor Mrs. Campbell's labor at defendant hospital knew that her baby was in the footling breech presentation by 1:30 p.m. on the date of delivery, no one informed either Mrs. Campbell or her husband about this fact or its significance. Dr. Deyton elected to proceed with a vaginal delivery despite the position of the baby.

Dr. Deyton performed a vaginal delivery at about 7:00 p.m. on 30 April. For several hours prior to delivery, the nurses monitoring the baby observed complications which they believed were affecting the condition of the fetus adversely. Nurse Debra Cannon expressed some of these concerns to Dr. Deyton, but she did not contact her immediate supervisor or anyone else when Dr. Deyton failed to address these complications.

Prior to delivery, the baby's umbilical cord became wrapped around her legs. It was later determined that the child, plaintiff Jennifer Campbell, sustained brain damage due to severe asphyxia from the "entangled cord." Jennifer has cerebral palsy and requires constant care and supervision.

The court denied defendant hospital's motions for a continuance prior to and at the time of trial. The court prohibited defendant hospital from making any reference to Dr. Deyton's participation as a defendant in the case during the trial. The court admitted into evidence, over objection, a "Day-in-the-Life" videotape of the minor-plaintiff.

At the close of all the evidence the following six issues were submitted to the jury and answered as follows:

1. Were plaintiffs, Jennifer Love Campbell, and Jeffrey L. Campbell injured by the negligence of Nurses Cannon and/or Copeland, acting as agents of defendant Pitt County Memorial Hospital, Inc.?

ANSWER: No.

2. Were the plaintiffs, Jennifer Love Campbell and Jeffrey L. Campbell, injured by the negligent failure of the defendant, Pitt County Memorial Hospital to insure that plaintiff[s'] informed consent ha[d] been obtained?

ANSWER: Yes.

3. Were the plaintiffs, Jennifer Love Campbell and Jeffrey L. Campbell, injured by the corporate negligence of the defendant, Pitt County Memorial Hospital, Inc.?

ANSWER: Yes.

4. What amount, if any, is plaintiff, Jeffrey L. Campbell, entitled to recover for emotional pain and suffering?

ANSWER: $5,000.

5. What amount, if any, is the plaintiff, Jeffrey L. Campbell, parent of Jennifer Love Campbell, entitled to recover?

ANSWER: $1,646,000.

6. What amount, if any, is the plaintiff, Jennifer Love Campbell, entitled to recover?

ANSWER: $4,850,000.

The court granted defendant's motion for judgment notwithstanding the verdict as to issue #3. The court found that the jury's awards in issue #5 and issue #6 were excessive, appeared to be given under the influence of passion and prejudice, and were unsupported by the evidence. Accordingly, as to issue #5, a remittitur of $1,000,000 was entered, reducing the sum awarded to $646,000. No remittitur was entered for issue #6. The court granted defendant's motion for a new trial as to issue #6 only. With the above modifications and after making an adjustment for plaintiffs' settlement with Dr. Deyton and his medical group, the court entered judgment in accordance with the verdict and ordered that defendant pay a portion of plaintiffs' costs pursuant to N.C. Gen. Stat. § 6-20.

Plaintiffs and defendant appealed.

*Tharrington, Smith & Hargrove, by John R. Edwards and Burton Craige; Kirby, Wallace, Creech, Sarda & Zaytoun, by Robert Zaytoun, for plaintiffs.*

*Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, by Robert M. Clay and Alene M. Mercer, for defendant Pitt County Memorial Hospital, Inc.*

*Bell, Davis & Pitt, P.A., by William Kearns Davis and Stephen M. Russell, for North Carolina Association of Defense Attorneys as amicus curiae.*

*Kevin B. Yow and Harris, Cheshire, Leager & Southern, by Samuel O. Southern, for North Carolina Hospital Association as amicus curiae.*

WELLS, Judge.

*Defendant's Appeal*

[1]  Defendant contends the court erred in failing to grant its motions for a continuance. We disagree.

"Continuances are not favored and the party seeking a continuance has the burden of showing sufficient grounds for it."

*Shankle v. Shankle*, 289 N.C. 473, 223 S.E. 2d 380 (1976). "The granting of a continuance is within the discretion of the trial court and absent a manifest abuse of discretion its ruling is not reviewable on appeal." *Lumbermens Mut. Cas. Co. v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 70 N.C. App. 742, 321 S.E. 2d 10 (1984).

Defendant contends that its counsel was unprepared for trial because plaintiffs first informed defendant on 15 February 1985, approximately one month before trial, that either twenty-two or twenty-three persons would be expert witnesses for plaintiffs at trial. Defendant argues that the burden of attending depositions between 25 February and 14 March made it impossible to prepare adequately for trial.

We hold, however, that defendant has failed to show any substantial prejudice to its rights by this alleged burden. *Suggs v. Carroll*, 76 N.C. App. 420, 333 S.E. 2d 510 (1985). Accordingly, we hold that the court did not err in denying defendant's motions for a continuance.

[2] Defendant contends that the court erred in prohibiting any references to Dr. Deyton's participation as a defendant in the case. However, we hold, following *Cates v. Wilson*, 83 N.C. App. 448, 350 S.E. 2d 898 (1986), that the court properly excluded references to Dr. Deyton's participation as a defendant. Specifically, any such references were properly excluded as irrelevant under N.C. Gen. Stat. § 8C-1, Rule 402 of the North Carolina Rules of Evidence and as contravening the strong public policy favoring settlement of controversies out of court. *Cates, supra.*

[3] Defendant contends the court erred in admitting a "Day-in-the-Life" videotape of Jennifer Campbell. We disagree.

Videotapes generally are admissible into evidence under North Carolina law for both illustrative and substantive purposes. N.C. Gen. Stat. § 8-97; *State v. Strickland*, 276 N.C. 253, 173 S.E. 2d 129 (1970). In *Strickland*, our Supreme Court observed that

> the use of properly authenticated moving pictures to illustrate a witness' testimony may be of invaluable aid in the jury's search for a verdict that speaks the truth. However, the powerful impact of this type of evidence requires the trial judge to examine carefully into its authenticity, relevan-

cy, and competency, and—if he finds it to be competent—to give the jury proper limiting instructions at the time it is introduced.

Based on our review of the record we hold that the court (1) did examine carefully into the authenticity, relevancy, and competency of the videotape, (2) found that it was admissible and (3) gave the jury proper limiting instructions at the time it was introduced. *Strickland, supra.* Mrs. Campbell testified that she had viewed the videotape and that it accurately illustrated Jennifer's daily activities, capabilities, and physical deficiencies. Although the court did not view the tape before it was played to the jury, the court heard arguments on the admissibility of the tape in which the nature of the tape, how it was made, its length and the principals involved all were described. After ruling the tape admissible in its entirety, the court gave the jury the following limiting instruction:

> And I instruct you now that you would not consider this video tape as proof for the purpose of establishing the truth of any matter in this lawsuit. You would consider it for the purposes of illustrating the testimony of witnesses, if in fact you find that it does illustrate testimony of witnesses in this lawsuit, and would not consider it for any other purpose.

> It is not offered nor is it received for any purpose other than as illustrative of witnesses' testimony.

Defendant further emphasizes that its counsel had inadequate notice "as to the filming of the videotape because counsel for defendant was not invited to the taping session and did not receive an opportunity to view the tape until the first day of trial."

We recognize that, in order to prevent any likelihood of unfair surprise, the better practice is to provide notice to both opposing counsel and the trial court prior to taping. Passanante, "The Use of Clinical and 'Day-in-the-Life' Presentations in Personal Injury Litigation: A Rising Star in the American Courtroom," 20 Wake Forest L. Rev. 121 (1984). We hold however, that plaintiffs' failure to provide such notice here did not render the tape inadmissible. Rather, as we have emphasized above, the admissibility of the videotape under the particular facts and circum-

stances of this case lay solely within the sound discretion of the trial court. As defendant has not shown that the court abused its discretion by admitting the evidence, we find no error.

Defendant contends the court erred in allowing "cross-examination of defendant's witnesses with purported quotes from depositions not in evidence and with hypothetical questions which were inflammatory and irrelevant to the facts of the case." We have reviewed each of these exceptions and find no prejudicial error in the court's findings. *See Cole v. Duke Power Co.*, 81 N.C. App. 213, 344 S.E. 2d 130, *disc. rev. denied*, 318 N.C. 281, 347 S.E. 2d 462 (1986).

[4] Defendant contends the court improperly submitted issue #2 and issue #3 to the jury. Both of these issues involve the question of corporate negligence. In essence, during trial plaintiffs presented evidence establishing two separate duties which they alleged defendant owed to them under the doctrine of corporate negligence. The first duty concerns informed consent, and it is addressed by issue #2 which reads: "Were the plaintiffs . . . injured by the negligent failure of the defendant . . . to insure that plaintiff[s'] informed consent ha[d] been obtained?"

The second duty concerns the absence of an operational and effective chain of command at the hospital and it is addressed by issue #3 taken with the jury charge for this issue. Issue #3 reads: "Were the plaintiffs . . . injured by the corporate negligence of the defendant . . .?" The court charged the jury, under issue #3, in pertinent part:

> In this regard, ladies and gentlemen, I instruct you that if the plaintiffs have proved by the greater weight of the evidence that the defendant hospital was negligent in failing to make a reasonable effort to monitor and oversee the treatment of Margaret and Jennifer Campbell by Dr. Deyton, . . . [in] that the hospital had a duty to make a reasonable effort to establish a mechanism for the prompt reporting of any situation that created a threat to the health of a patient so that such reporting is effective to safeguard the health of the patient and can be done without fear of reprisal, and that the defendant failed to do that;

And, if the plaintiffs have further satisfied you from the evidence and by its greater weight that such negligence, if any, was a proximate cause of injury to the plaintiff, it would be your duty to answer this issue "Yes" in favor of the plaintiff.

The jury answered both issues in the affirmative.

In summary, issues #2 and #3 respectively raise the following two dispositive questions affecting defendant's corporate liability to plaintiffs: (1) whether plaintiffs' injuries were caused by a breach of a duty owed directly by defendant hospital to plaintiffs to insure that plaintiffs' informed consent to a vaginal delivery of a footling breech baby had been obtained prior to the actual delivery of the minor-plaintiff and (2) whether plaintiffs' injuries were caused by a breach of a duty owed directly by defendant hospital to plaintiffs to establish an effective mechanism for the prompt reporting of any situation that created a threat to the health of a patient such as the minor-plaintiff here. An affirmative answer to either issue would establish defendant hospital's corporate liability to plaintiffs.

For the reasons discussed below, we hold that defendant, under the doctrine of corporate negligence set forth in *Bost v. Riley*, 44 N.C. App. 638, 262 S.E. 2d 391, *disc. rev. denied*, 300 N.C. 194, 269 S.E. 2d 621 (1980) as applied to the specific facts and circumstances of this case, did have a legal duty to insure that plaintiffs' informed consent to a vaginal delivery of a footling breech baby had been obtained prior to delivery. We further hold that the evidence, when viewed in the light most favorable to plaintiffs, was sufficient to establish defendant's liability as a corporate entity for damages resulting from defendant's breach of this duty. Regarding issue #3, we hold that defendant also had a duty under the doctrine of corporate negligence set forth in *Bost* as applied to the specific facts and circumstances of this case to establish an effective mechanism for the prompt reporting of any situation that created a threat to the health of a patient such as the minor-plaintiff here. We further hold that the evidence, when viewed in the light most favorable to plaintiffs, was sufficient to establish defendant's liability as a corporate entity for damages resulting from defendant's breach of this duty.

In *Bost, supra*, this Court expressly recognized the doctrine of corporate negligence, which involves the violation of a duty owed directly by the hospital to the patient, as a basis for liability apart and distinct from *respondeat superior*. In this regard, we stated:

> If, as our Supreme Court has stated, a patient at a modern-day hospital has the reasonable expectation that the hospital will attempt to cure him, it seems axiomatic that the hospital have the duty assigned . . . to make a reasonable effort to monitor and oversee the treatment which is prescribed and administered by physicians practicing at the facility.

Plaintiffs presented the following pertinent evidence regarding defendant's duty to insure plaintiffs' informed consent had been obtained:

Approximately five weeks before delivery, Mrs. Campbell learned that her baby was in the "bottom first" breech position. She was admitted to the hospital around midday on 30 April 1979 in early active labor. Mrs. Campbell informed the admitting nurse that her doctor had said "to check me for being breech." Shortly after admission, Dr. Deyton determined by pelvic x-ray that the baby was in the footling breech presentation. When Mrs. Campbell returned to the labor room, a footling breech was confirmed by vaginal examination.

Plaintiffs presented evidence that in 1979 obstetricians and labor and delivery nurses were aware of the higher risks of vaginal delivery for a baby in the footling breech presentation. Plaintiffs' experts indicated that the primary risk was umbilical cord entanglement and resulting asphyxia and that this risk could be avoided by a Cesarean delivery.

Plaintiffs' nursing experts testified that the nurses treating Mrs. Campbell in the hospital's labor room were required under the standard of practice for nurses with similar training and expertise to assure "prior to the performance" of any procedures that Mr. and Mrs. Campbell had been informed by their physician that the baby was in the footling breech position and that they were informed of the relative risks of a vaginal delivery, as opposed to Cesarean delivery, under these circumstances. Dr.

Moore, a perinatal nurse, explained in this regard: "Explaining the risk of alternative procedures would be the responsibility of the physician[;] [a]ssuring that the patient has had an explanation would be the responsibility of the nurse."

Nurse Susan Rumsey, another expert for plaintiff, testified that a parent who had been informed that its baby was in the footling breech presentation and who had been informed of the risks of a vaginal delivery ordinarily "would opt for a safer procedure." Accordingly, failure to see that informed consent had been obtained "could have affected the outcome . . ." here in Nurse Rumsey's opinion.

Plaintiffs presented evidence that (1) Dr. Deyton never informed either Mr. or Mrs. Campbell that the baby was in the footling breech presentation and the attendant risks of vaginal versus Cesarean delivery and (2) Nurses Copeland and Cannon, who attended Mrs. Campbell during labor and delivery, never asked either Mr. or Mrs. Campbell whether they were aware of the position of the baby or whether Dr. Deyton had spoken with them about the baby's footling breech presentation and its significance for a vaginal versus Cesarean delivery.

In 1979, the hospital had a policy which required that consent be obtained prior to procedures being performed at the hospital. In this regard labor and delivery nurses were charged with the responsibility of obtaining the signature of the parents on a hospital consent form before delivery. No one at the hospital presented Mr. or Mrs. Campbell with this consent form prior to Jennifer's birth. Nurse Cannon did present the consent form to Mr. Campbell shortly after Jennifer's birth when Mr. Campbell was still unaware of Jennifer's condition, and Mr. Campbell signed it. At this time, Mr. Campbell did not know that Jennifer had been in the footling breech position, and he did not know the risks of vaginal delivery under these circumstances. The form provided, in pertinent part, that: "The nature and the purpose of the operation, possible alternative methods of treatment, the risks involved . . . have been fully explained to me."

Mrs. Campbell testified that the first time she was aware that Jennifer was in the footling breech presentation was when her attorney obtained a copy of her medical records from the hospital. Both Mr. and Mrs. Campbell testified that, if they had been

advised of the risks of vaginal versus Cesarean delivery prior to delivery, they would have elected the latter method of delivery.

We hold that the foregoing evidence establishes that the hospital's general obligation "to make a reasonable effort to monitor and oversee the treatment" pursuant to *Bost, supra*, included the specific duty, under the particular facts and circumstances of this case, to make a reasonable effort to insure that plaintiffs' informed consent to a vaginal delivery of a footling breech baby had been obtained prior to delivery. Plaintiffs' evidence is also sufficient to establish that defendant-hospital's failure to perform this duty was a proximate cause of Jennifer's injuries. *See Bost, supra; Sasser v. Beck*, 65 N.C. App. 170, 308 S.E. 2d 722 (1983), *disc. rev. denied*, 310 N.C. 309, 312 S.E. 2d 652 (1984). Accordingly, we hold that the court properly submitted issue #2 to the jury.

Plaintiffs presented the following pertinent evidence regarding defendant's duty to have an operational and effective chain of command:

By approximately 5:00 p.m. on the date of delivery, Nurse Cannon, who was monitoring Mrs. Campbell's labor through the use of an electronic fetal heart rate monitor, was aware that Mrs. Campbell's baby was in distress, and she informed Dr. Deyton about the problems she was observing. By 5:23 p.m., Nurse Cannon acknowledged that "all of the various signs [that] could indicate fetal hypoxia . . ." were present on the fetal heart rate monitor. Despite the fact that Dr. Deyton did not respond to the information relayed to him by Nurse Cannon, at no time did she notify her supervisor or anyone else in her administrative chain of command.

Plaintiffs' nursing experts testified that, if an attending nurse concludes that a treating physician's actions are negligent or dangerous, then he or she must act to protect the patient by contacting a supervisor. In the instant case, plaintiffs' experts testified that by 5:30 or earlier when Dr. Deyton failed to take any action to deliver the baby, Nurse Cannon had a duty to notify her supervisor that a life-threatening situation existed.

Plaintiffs presented further evidence showing that the reason why Nurse Cannon did not contact a supervisor was because the

hospital had failed to establish a mechanism for the reporting of negligent or dangerous treatment. Plaintiffs presented evidence through experts that every hospital must have an established mechanism for reporting negligent or dangerous treatment so that such reporting can go through official channels and be done without fear of reprisal. Finally, plaintiffs presented evidence that defendant hospital had failed to establish such a mechanism and that, if it had, Jennifer would not have suffered brain damage.

Once again, we hold that plaintiffs presented sufficient evidence to show that the hospital's general obligation "to make a reasonable effort to monitor and oversee the treatment" pursuant to *Bost, supra*, included the specific duty, under the particular facts and circumstances of this case, to establish an effective mechanism for the prompt reporting of any situation that created a threat to the health of a patient such as the minor-plaintiff here. Plaintiffs' evidence is also sufficient to demonstrate that defendant-hospital's failure to perform this duty was a proximate cause of Jennifer's injuries. *See Bost, supra; Sasser, supra*. Accordingly, we hold that the court properly submitted issue #3 to the jury.

*Citing Jones v. New Hanover Hospital*, 55 N.C. App. 545, 286 S.E. 2d 374, *disc. rev. denied*, 305 N.C. 586, 292 S.E. 2d 570 (1982), defendant contends that issues #2 and #3 "should not have been submitted to the jury as this case arose in 1979, prior to the *Bost* declaration of the new duties of hospitals." It was apparently on this basis that the trial court granted defendant's motion for judgment notwithstanding the verdict as to issue #3, since it expressly denied a conditional new trial, finding that plaintiffs' corporate negligence claim was supported by the evidence.

However, subsequent to *Jones* and the court's ruling here, we resolved this issue against defendant in *Blanton v. Moses H. Cone Hosp.*, 78 N.C. App. 502, 337 S.E. 2d 200 (1985), *disc. rev. allowed*, 316 N.C. 374, 342 S.E. 2d 890 (1986). In *Blanton*, we held that the doctrine of corporate negligence applies prospectively to causes of action arising after 20 January 1967, the date charitable immunity was abolished.

In light of *Blanton*, we hold that the court properly submitted issues #2 and #3 to the jury and that it improperly granted defendant's motion for judgment notwithstanding the verdict

based on *Jones, supra,* as to issue #3. However, the court's improper granting of judgment notwithstanding the verdict as to issue #3 did not materially affect the outcome of the case since the final judgment entered upholds the jury's verdict on defendant's liability to plaintiffs in issue #2.

[5] Defendant contends the court erred in submitting issue #4 to the jury and in allowing Mr. Campbell to recover the amount of $5,000 for his emotional pain and suffering as Jennifer's parent. We agree.

For a plaintiff to recover for emotional or mental distress in an ordinary negligence case, he must prove that such distress was the proximate result of some physical impact with or physical injury to himself also resulting from defendant's negligence. *Woodell v. Pinehurst Surgical Clinic, P.A.,* 78 N.C. App. 230, 336 S.E. 2d 716 (1985), *aff'd,* 316 N.C. 550, 342 S.E. 2d 523 (1986). As in *Woodell,* plaintiffs' evidence here shows "genuine emotional anguish" with no physical injury. Accordingly, following *Woodell,* we hold that the court improperly submitted issue #4 to the jury and that the portion of the court's judgment allowing recovery based on this issue must be reversed.

[6] Defendant contends the court abused its discretion in denying its motion to set aside the jury's verdict as to issue #5. We disagree.

In general,

The standard for review of a trial court's discretionary ruling either granting or denying a motion to set aside a verdict and order a new trial is virtually prohibitive of appellate intervention. Appellate review "is strictly limited to the determination of whether the record affirmatively demonstrates a manifest abuse of discretion by the judge." *Worthington v. Bynum,* 305 N.C. 478, 482, 290 S.E. 2d 599, 602 (1982). The trial court's discretion is " 'practically unlimited.' " *Id.,* 290 S.E. 2d at 603, quoting from *Settee v. Electric Ry.,* 170 N.C. 365, 367, 86 S.E. 1050, 1051 (1915). A *"discretionary* order pursuant to G.S. 1A-1, Rule 59 for or against a new trial upon *any* ground may be reversed on appeal only in those exceptional cases where an abuse of discretion is clearly shown." *Worthington,* 305 N.C. at 484, 290 S.E. 2d at 603.

"[A] manifest abuse of discretion must be made to appear from the record as a whole with the party alleging the existence of an abuse bearing that heavy burden of proof." *Id.* at 484-85, 290 S.E. 2d at 604. "[A]n appellate court should not disturb a discretionary Rule 59 order unless it is reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice." *Id.* at 487, 290 S.E. 2d at 605.

*Pearce v. Fletcher*, 74 N.C. App. 543, 328 S.E. 2d 889 (1985).

The jury here awarded Mr. Campbell $1,646,000 in its answer to issue #5. Plaintiffs, however, had presented evidence that the present value of Jennifer's medical expenses during her minority was only $646,708. The court found that this verdict was "excessive and appears to have been given under the influence of passion and prejudice and that the evidence was insufficient to justify the verdict." Plaintiffs consented to a remittitur of $1,000,000, reducing the award for issue #5 to $646,000, and the court entered judgment on issue #5 for this amount.

Applying the *Worthington* standard to the "cold record" here, we hold that it contains no indication of a manifest abuse of the court's discretion. Accordingly, we hold that the court did not err in denying defendant's motion to set aside the jury's verdict as to issue #5.

Defendant contends that the court erred in its computation of pre-judgment interest. However, we do not reach this issue since defendant's exception to the court's computation was not made the basis of an assignment of error. N.C.R. App. Proc. 10(a).

Defendant contends the "the trial court's awarding of part of plaintiff[s'] costs was improper. . . ." Specifically, defendant contends that plaintiffs could not recover as costs charges of expert witnesses for time spent outside trial or expenses for more than two expert witnesses who testified about the standard of care applicable to nurses in similar communities. However, defendant here has not shown that the court exceeded its discretionary authority to award such costs pursuant to N.C. Gen. Stat. § 6-20. *See, e.g., Dixon, Odom & Co. v. Sledge*, 59 N.C. App. 280, 296 S.E. 2d 512 (1982), and we therefore reject this.

Campbell v. Pitt County Memorial Hosp.

*Plaintiffs' Appeal*

[7] Plaintiffs contend the court erred in setting aside the jury's award of $4,850,000 to Jennifer in issue #6. We disagree.

The jury awarded Jennifer $4,850,000 in general and special damages. The court proposed a remittitur of $2,425,000 which plaintiffs declined to accept. Accordingly, the court set aside this verdict and ordered a new trial as to this issue only, finding that the jury's verdict was excessive, appeared to be given under the influence of passion and prejudice, and was unsupported by the evidence.

While it appears to us from our examination of the "cold record" that this verdict was not the result of passion or prejudice nor unsupported by the evidence, applying the strict *Worthington* standard of appellate review followed and applied in *Pearce, supra*, we cannot say that the court's order "probably amounted to a substantial miscarriage of justice." *Pearce, supra*. Accordingly, we leave undisturbed the court's order granting defendant's motion for a new trial on the issue of Jennifer's damages.

Given our disposition of defendant's appeal, we do not reach plaintiffs' remaining arguments.

No error in part, reversed in part.

Judge BECTON concurring in part and dissenting in part.

Judge ORR dissenting in part.

Judge BECTON concurring in part and dissenting in part.

I

In *Cox v. Haworth*, this Court, in an opinion I authored, declined the Coxes' invitation "*to impose a duty* upon a hospital to properly inform and advise a patient of the nature of a medical procedure to be performed . . . when the patient [had been] admitted to the hospital for an operation under the care of his privately retained physician." 54 N.C. App. 328, 331, 283 S.E. 2d 392, 394-95 (1981) (emphasis added). *Cox* is a summary judgment

case, and it is distinguishable from the case *sub judice*. The Coxes forecasted no evidence of any duty the hospital had which would invoke the doctrine of corporate negligence. In *Cox* we were asked to determine if a court could impose such a duty on a hospital. In the case *sub judice*, we are asked to determine whether a court should instruct a jury regarding a duty which, the evidence shows, the hospital had imposed on itself.

Judicial enforcement of a duty that a hospital imposes upon itself is significantly different than judicial imposition of a new duty on a hospital. That a hospital can violate a duty it created and owed is clear from the following quote from *Bost v. Riley*:

> The plaintiff in the present case has introduced evidence tending to show that the defendant surgeons failed to keep progress notes on Lee's condition for a number of days in succession following the operation of 6 August 1974, *in violation of a rule promulgated by Catawba*. Catawba took no action against the surgeons for their violation. *While this evidence is sufficient to show that Catawba may have violated the duty it owed to Lee to adequately monitor and oversee his treatment*, plaintiff has offered no evidence to show that this omission contributed to Lee's death.

(Emphasis added.) 44 N.C. App. 638, 648, 262 S.E. 2d 391, 397, *disc. rev. denied*, 300 N.C. 194, 269 S.E. 2d 621 (1980).

In the case before us, plaintiff's expert witnesses testified that defendant's labor room nurses were required under the standard of practice for nurses with similar training and experience to assure, prior to any procedure, that the plaintiffs had been informed by their physician that the baby was in the footling breech position and of the relative risk of a vaginal delivery. One witness explained: "Assuring that the patient has had an explanation would be the responsibility of the nurse." Moreover, plaintiffs presented evidence that in 1979 defendant hospital had a policy requiring labor and delivery room nurses to obtain the signature of patients on a hospital consent form before delivery. Believing that the foregoing evidence supported the instructions given by the trial court, I concur in the result reached on the informed consent issue.

## II

A trial judge's discretionary power is broad, but not unlimited. *Hensley v. McDowell Furniture Co.*, 164 N.C. 148, 150, 80 S.E. 154, 155 (1913). And trial judges cannot insulate their orders setting aside jury verdicts from appellate review simply by cloaking their orders in the mantle of "passion and prejudice" and "insufficient evidence." Appellate courts are required to look behind the conclusory statements of trial judges to determine whether trial judges have abused their discretion. Indeed, only after our Supreme Court combed the record as a whole in *Worthington v. Bynum*, 305 N.C. 478, 290 S.E. 2d 599 (1982) was the Court able to sustain the trial judge's decision to set aside the verdict on account of excessiveness. In the case *sub judice* the trial judge cited nothing (and my review, as well as that of the majority, ante p. 18, reveals nothing) in the record or the conduct of the trial, to support a finding of passion and prejudice. Similarly, the trial judge did not indicate in what respect (and I have found none) plaintiffs' evidence was insufficient to justify the jury award. Thus, believing that *Worthington* is distinguishable and that, in the case *sub judice*, the trial judge abused his discretion by nullifying the jury's verdict, I dissent.

Judge ORR dissenting in part.

The majority expands the hospital's duty in this case to require the hospital to make a reasonable effort to insure that the patient's informed consent to delivery of a footling breech baby has been obtained prior to delivery. This duty applies, according to the majority, even though the patient was being treated by her own private physician. I find no support in our statutes or case law for such an extension of a hospital's duty. Furthermore, this requirement would appear to constitute a major invasion of the physician/patient relationship and place an unworkable burden upon hospitals.

*Bost v. Riley*, 44 N.C. App. 638, 262 S.E. 2d 391, *disc. rev. denied*, 300 N.C. 194, 269 S.E. 2d 621 (1980), relied upon by the majority, does not, in my opinion, mandate such an expansion. *Bost* states that "the hospital [has] the duty . . . to make a reasonable effort to monitor and oversee the treatment which is prescribed and administered by physicians practicing at the facili-

ty." *Bost*, 44 N.C. App. at 647, 262 S.E. 2d at 396. A reasonable effort on the part of a hospital to insure that quality medical care is being provided to patients by private physicians with privileges at the hospital is an accepted hospital practice. Likewise, where hospital staff become aware of a patient's lack of informed consent, or negligent treatment of a patient by a private physician, they have a duty to report it to the person designated by the hospital to take appropriate corrective action.

However, the duty to make a reasonable effort to monitor and oversee treatment does not extend to the direct intervention in the physician/patient relationship as it applies to informed consent.

In *Bost* our Court stated, "Since all of the above duties which have been required of hospitals in North Carolina are duties which flow *directly from the hospital to the patient*, we acknowledge that a breach of any such duty may correctly be termed corporate negligence. . . ." *Bost*, 44 N.C. App. at 647, 262 S.E. 2d at 396 (emphasis added). The duties referred to included: (1) the duty to make a reasonable inspection of equipment used by the hospital in the treatment of patients and remedy any defects discoverable by such inspection, *Payne v. Garvey*, 264 N.C. 593, 142 S.E. 2d 159 (1965); (2) the duty to provide equipment reasonably suited for the use intended, *Starnes v. Hospital Authority*, 28 N.C. App. 418, 221 S.E. 2d 733 (1976); (3) the duty not to obey instructions of a physician which are obviously negligent or dangerous, *Byrd v. Hospital*, 202 N.C. 337, 162 S.E. 738 (1932); (4) a duty to promulgate adequate safety rules relating to the handling, storage and administering of medications, *Habuda v. Hospital*, 3 N.C. App. 11, 164 S.E. 2d 17 (1968); and (5) the failure to adequately investigate the credentials of a physician selected to practice at the facility, *Robinson v. Duszynski*, 36 N.C. App. 103, 243 S.E. 2d 148 (1978). *Bost v. Riley*, 44 N.C. App. at 647, 262 S.E. 2d at 396.

Noticeably missing from these enumerated hospital duties is the duty to insure that a patient's informed consent has been obtained when that patient is being treated in the hospital by a private physician. As previously pointed out, the Court in *Bost* concluded that the duties imposed on hospitals flow directly from the hospital to the patient. In this case a duty to insure that a pa-

tient's informed consent has been obtained does not flow directly from the hospital to the patient. There is an intervening party — the private treating physician who is the person directly responsible for obtaining a patient's informed consent. *Bost*, therefore, cannot be read as authority for imposing such a duty on a hospital where the patient has a private treating physician.

Furthermore, this Court has previously refused to extend the doctrine of informed consent in a similar situation. In *Cox v. Haworth and Cox v. Haworth*, 54 N.C. App. 328, 283 S.E. 2d 392 (1981), this Court was asked "to impose a duty upon a hospital to properly inform and advise a patient of the nature of a medical procedure to be performed on him when the patient is admitted to the hospital for an operation under the care of his privately retained physician." 54 N.C. App. at 331, 283 S.E. 2d at 394-95.

In *Cox*, plaintiff alleged that defendant hospital was liable under a corporate negligence theory. Plaintiff's private physician performed a myelogram on plaintiff at defendant hospital which resulted in a failure to remove all the dye injected into plaintiff's spinal canal. Plaintiff contended that the hospital had a duty to obtain his informed consent before the plaintiff's private physician performed the myelogram. A unanimous Court declined to impose such a duty on the hospital and relied on *Bost*.

> We do not read *Bost* or the cases cited therein to impose a duty on the Hospital to obtain the informed consent of Mr. Cox under the facts of this case. The role of the Hospital in the entire procedure was to provide facilities and support personnel for Dr. Haworth. Any liability imputed to the Hospital would have to flow from acts or omissions which were a part of the function it performed in the myelogram.

> This Court has held that if circumstances warrant, a physician has a duty to warn a patient of consequences of a medical procedure. *Brigham v. Hicks*, 44 N.C. App. 152, 260 S.E. 2d 435 (1979). The physician in this case was Mr. Cox's own privately retained physician. Any duty to inform Mr. Cox of the risks of the procedures would have been on the privately retained physician, not on the Hospital or its personnel. Consequently, we find that the Hospital had no duty to inform Mr. Cox of the risks and procedures to be used in the administration of the myelogram or to secure his in-

formed consent when Mr. Cox hired his private physician to perform the myelogram.

*Cox v. Haworth and Cox v. Haworth*, 54 N.C. App. at 332-33, 283 S.E. 2d at 395-96.

Whether a party has a legal duty to another is not a question of fact to be decided by a jury based upon expert testimony or other evidence.

> The question of the existence of a legal duty of care in a given factual situation presents a question of law which is to be determined by the Courts alone. (*Elam v. College Park Hospital, supra*, 132 Cal. App. 3d at p. 339; *Peter W. v. San Francisco Unified Sch. Dist.* (1976) 60 Cal. App. 3d 814, 822 [131 Cal. Rptr. 854]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 493, p. 2756.)

*Clarke v. Hoek*, 174 Cal. App. 3d 208, 213, 219 Cal. Rptr. 845, 848-49 (1985).

> Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law. (Citations omitted.) The duty may arise specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, . . . .

*Pinnix v. Toomey*, 242 N.C. 358, 362, 87 S.E. 2d 893, 897 (1955).

In the case *sub judice* the trial court's jury instruction as to the informed consent issue indicated that the jury had to determine whether plaintiff had proven that the hospital had a duty to insure the patient's informed consent was obtained. This was clearly in error. In *Clarke*, plaintiff sought to interject the issue of foreseeability into that of duty, thus making a question of fact for the jury. There the Court stated:

> [w]hile it is the province of the jury, as trier of fact, to determine whether an unreasonable risk of harm was foreseeable under the particular facts of a given case, the trial court must still decide as a matter of law whether there was a duty in the first place, even if that determination includes a con-

sideration of foreseeability. (*Stout v. City of Porterville* (1983) 148 Cal. App. 3d 937, 941 [196 Cal. Rptr. 301]; *Peter W. v. San Francisco Unified Sch. Dist., supra,* 60 Cal. App. 3d at pp. 822-23.)

*Clarke v. Hoek,* 174 Cal. App. 3d at 214, 219 Cal. Rptr. at 849.

Likewise, in this case whatever issues of fact may have arisen, it is still a question of law whether there was a duty on the part of the hospital. As previously pointed out, I find no support in our law for extending a hospital's duty as required by the majority.

Finally, to impose such a duty on hospitals would place hospital personnel in the untenable position of interjecting themselves into the physician/patient relationship and producing an unworkable requirement on hospital staffs. This could result in the disturbing duty of going behind a treating physician's back in order to determine if the patient has been "informed" about the procedure in question and the inherent risks involved.

> As has been observed by our [N.Y.] Court of Appeals, the relationship between the physician and his patient "is always one of great delicacy. And it is perhaps the most delicate matter, often with fluctuating indications, from time to time with the same patient, whether a physician should advise the patient (or his family), more or less, about a proposed procedure, the gruesome details, and the available alternatives. Such a decision is particularly one calling for the exercise of medical judgment. . . . In the exercise of that discretion, involving as it does grave risks to the patient, a third party should not ordinarily meddle. . . ." *Fiorentino v. Wenger,* 19 N.Y. 2d 407, 415-16.

*Prooth v. Wallsh,* 105 Misc. 2d 603, 603, 432 N.Y.S. 2d 663, 665 (1980).

The logical extension of the new duty imposed on hospitals by the majority is potentially fraught with problems. As a practical matter, what hospital staffer should determine whether a patient's informed consent to a procedure had been obtained? Is it the admission clerk at the front desk or a nurse assigned to the patient's care? To what medical procedures or treatment does the duty apply? If a thoracic surgeon is prepared to perform by-pass

In re Register

surgery, is it the hospital's duty to insure that the risks and alternative treatments have been explained? If a privately retained physician determines that a hospitalized patient should take a certain medication with known side effects, is the hospital required to determine if the patient's informed consent has been obtained before a nurse administers the medication? Should a hospital be required to insure that a privately retained obstetrician has informed a patient of the risks and alternatives involved in a footling breech delivery and that the patient has consented? The majority apparently says that a hospital has such a duty. I disagree and for the reasons set forth above, I dissent from that portion of the majority opinion imposing a duty on the hospital to insure that a patient's informed consent has been obtained prior to treatment performed by a privately retained physician. As to the other parts of Judge Wells' opinion, I concur.