VICKIE ANN BROWN, Administratrix of the Estate for Mary Louise Brown, Plaintiff-Appellee v. KENNETH MICHAEL FLOWE, M.D., Defendant-Appellant

No. COA97-611

(Filed 3 March 1998)

**1. Judgments § 651 (NCI4th)— prejudgment interest—settlement amount with other parties included—double recovery**

The trial court erred in a medical malpractice claim by awarding plaintiff prejudgment interest on the full amount of the verdict where plaintiff had settled with another doctor and the hospital. Plaintiff would be doubly compensated if she were allowed to have the use and benefit of the settlement amount and then also receive prejudgment interest on the full amount of the verdict.

**2. Costs § 10 (NCI4th)— medical malpractice—costs—court's discretion**

Defendant failed to demonstrate that the trial court exceeded its discretionary authority in awarding costs in a medical malpractice action.

**3. Physicians, Surgeons, and Other Health Care Professionals § 96 (NCI4th)— medical malpractice—surgery—primary physician—vicarious liability for resident—directed verdict**

The trial court did not err in a medical malpractice action by granting a directed verdict for plaintiff on the issue of defendant's vicarious liability for Dr. Pabst's negligence where the evidence was documentary and defendant did not deny the authenticity or correctness of those documents, so that the credibility of the evidence was manifest, and the evidence was sufficient to clearly establish defendant's vicarious liability. Defendant was a member of the faculty of the School of Medicine and had been granted clinical privileges, while Dr. Pabst was a fourth-year surgical resident at the hospital and did not have clinical privileges, and defendant controlled Dr. Pabst's manner of performance during the surgery in that he advised her to perform the action which ultimately led to the decedent's death.

Appeal by defendant from judgment entered 30 September 1996 by Judge Clifton W. Everett, Jr. in Pitt County Superior Court. Heard in the Court of Appeals 13 January 1998.

BROWN v. FLOWE

[128 N.C. App. 668 (1998)]

*Faison & Gillespie, by O. William Faison and John W. Jensen, for plaintiff-appellee.*

*Walker, Barwick, Clark & Allen, L.L.P., by Thomas E. Barwick, for defendant-appellant.*

WALKER, Judge.

This appeal arises from a medical malpractice action brought by plaintiff, administratrix of the estate for Mary Louise Brown (decedent), on 15 July 1994 against defendant Dr. Kenneth Michael Flowe. At all relevant times, defendant was employed as an instructor with the East Carolina University School of Medicine (School of Medicine). Further, the School of Medicine has an agreement with Pitt County Memorial Hospital (the Hospital) whereby the Hospital is utilized as the primary teaching hospital of the School of Medicine in the training and education of its medical students.

In her complaint, plaintiff alleges that on 29 July 1993 decedent was brought to the Hospital's emergency room complaining of upper abdominal pain, nausea and vomiting. She was diagnosed by defendant as suffering from acute gallbladder disease, and admitted under his care for surgery to remove her gallbladder.

On 3 August 1994 decedent was prepared for a laparascopic cholecystectomy, whereby her gallbladder would be surgically removed by the use of a laparoscope. This procedure requires two or more physicians to perform the various steps. Defendant was the attending physician during this surgery, and he selected Dr. Susan Pabst (Dr. Pabst), a fourth-year surgical resident, to assist him.

A laparascopic cholecystectomy involves the use of two instruments known as a trocar and a cannula. The trocar is a surgically sharp spike used to pierce the abdomen, and once entry is gained it is withdrawn. The cannula is a sealed metal tube in which the trocar is initially encased, and through which the laparoscope and other surgical instruments can be inserted once the trocar is removed.

The defendant's testimony at trial tended to show that after the initial incision was made near the center of the decedent's abdominal wall, the laparoscope was inserted into a cannula so that the procedure could be viewed from inside the abdomen. Next, a trocar was inserted into the upper left abdominal region by Dr. Pabst. As she was inserting this trocar, Dr. Pabst told defendant that she was encountering some resistance, and defendant advised her to use slow, steady

pressure. As Dr. Pabst began to apply this pressure, the trocar slipped and pierced decedent's liver, producing a small amount of blood on the tissues below the liver. After vacuuming the visible blood and inspecting the areas around the liver for any reaccumulation of blood or the swelling or distension of any surrounding tissues, defendant continued the surgery by placing another trocar in the upper right abdominal region.

Within one to two minutes after the initial piercing of the liver, defendant was advised by the anesthesiologist that decedent's blood pressure had dropped drastically, from around 150 systolic to 50 systolic. Initially, defendant concluded that, given decedent's age and previous heart problems, the drop could have been attributable to cardiogenic shock. While the anesthesiologist was attempting to resuscitate the decedent and determine whether the drop was attributable to a heart condition, defendant left the operating room briefly to discuss the situation with decedent's family.

Upon his return, defendant was advised that the drop in decedent's blood pressure was not related to her heart condition. Defendant then began to make a large incision into decedent's abdomen in order to determine the source of the blood loss. At this time, defendant discovered a large amount of blood in the peritoneal cavity, the thin layer of tissue that lines the abdominal cavity. After determining that the pooled blood was arterial due to its bright red color, defendant proceeded to clamp the aortic artery in order to reduce further blood loss, and then looked for the source of the bleeding. However, despite defendant's efforts to resuscitate decedent, she died from severe blood loss after being in surgery for approximately four hours. The pathologist's report indicated that the probable cause of the blood loss was a tear in the celic artery, a short artery located in the abdominal area.

On 22 June 1994, prior to filing this action, plaintiff entered into a settlement with the Hospital and Dr. Pabst. In consideration for the sum of $178,486.76, plaintiff agreed to release those parties from all liability arising out of the events surrounding decedent's death. Thereafter, plaintiff instituted this action alleging that defendant was negligent in performing the surgery on decedent, and that he was vicariously liable for the negligent acts of the resident surgeon, Dr. Pabst.

At trial after plaintiff's evidence was presented, defendant's motion for a directed verdict was denied. At the close of all the evi-

dence, plaintiff moved for a directed verdict on the issue of whether defendant was vicariously liable for the acts of Dr. Pabst under the doctrine of *respondeat superior*. After hearing arguments from both parties, the trial court granted plaintiff's motion. Thereafter, the jury returned a verdict finding defendant negligent and awarded damages to plaintiff in the amount of $250,000.00. Subsequently, defendant's motion for a judgment notwithstanding the verdict (JNOV), or alternatively for a new trial, was denied by the trial court.

Following the jury verdict, the trial court ordered defendant to pay costs to plaintiff in the amount of $42,101.44 for expenses incurred for such things as depositions, expert witness fees, travel expenses, counsel fees and the production of certain medical records. Further, the trial court ordered defendant to pay prejudgment interest, from the date the complaint was filed, on the entire $250,000.00 verdict at the legal rate of 8% per annum, which amounted to $43,018.70 in interest.

Defendant first contends the trial court erred by calculating the prejudgment interest before reducing the judgment by the amount of credit he was allowed as a result of plaintiff's prior settlement with the Hospital and Dr. Pabst. Next, he contends the trial court erred by taxing certain costs against him. And finally, he contends the trial court erred by directing a verdict as to his vicarious liability for Dr. Pabst's negligence.

[1] As to defendant's first assignment of error, he was entitled to a credit in the amount of $178,486.76 as a result of plaintiff's settlement with the Hospital and Dr. Pabst pursuant to N.C. Gen. Stat. § 1B-4, which states:

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
> > (1) It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater. . . .

N.C. Gen. Stat. § 1B-4(1) (1983). Therefore, we must determine whether the trial court should have calculated the prejudgment interest before or after applying this credit.

The statutory provision allowing prejudgment interest is N.C. Gen. Stat. § 24-5, which provides in pertinent part:

(b) Other Actions.—In an action other than contract, the portion of money judgment designated by the fact finder as compensatory damages bears interest from the date the action is instituted until the judgment is satisfied. Interest on an award in an action other than contract shall be at the legal rate.

N.C. Gen. Stat. § 24-5 (b) (1991). An award of prejudgment interest promotes the following public policy goals: (1) it compensates a plaintiff for the loss of use value of a damage award due to a delay in payment; (2) it prevents the defendant from being unjustly enriched for the use value of the money due to the delay in payment; and, (3) it promotes the prompt settlement of claims. *Powe v. Odell*, 312 N.C. 410, 413, 322 S.E.2d 762, 764 (1984); *see also Baxley v. Nationwide Mutual Ins. Co.*, 334 N.C. 1, 430 S.E.2d 895 (1993) (where the court held that "[c]learly the purpose of the award is to compensate a worthy plaintiff for the loss of the use of money that he or she has incurred due to the wrongful acts of another party." *Id.* at 8, 430 S.E.2d at 900).

Defendant argues that although this Court has recognized the principle that prejudgment interest must be taxed on the entire judgment, we have also stated that it should not be assessed against compensation for the same injury or damages already paid to plaintiff prior to judgment by a settling joint tortfeasor.

In support of this proposition, defendant cites this Court's decision in *Beaver v. Hampton*, 106 N.C. App. 172, 416 S.E.2d 8, *disc. review allowed*, 332 N.C. 664, 424 S.E.2d 398 (1992), *vacated on other grounds*, 333 N.C. 455, 427 S.E.2d 317 (1993), where we dealt with prejudgment interest in the context of an automobile negligence action. Plaintiff was injured when his tractor-trailer truck was struck by defendant's automobile. After plaintiff filed his claim, but prior to trial, defendant's liability insurance carrier tendered its policy limit of $25,000.00 and withdrew from the case. Thereafter, the jury returned a verdict in favor of plaintiff in the amount of $30,000.00. After subtracting the prior settlement, plaintiff's underinsured motorist carrier was required to pay $5,000.00 plus prejudgment interest. However, in calculating the amount of interest, the trial court deducted the $25,000.00 settlement and only awarded prejudgment interest on the remaining $5,000.00. On appeal, this Court held that:

[T]he trial court erred in failing to award prejudgment interest on the $25,000 paid by the liability carrier from the filing date until it was paid by the liability carrier on 30 March 1989. Regarding the remaining $5,000, prejudgment interest should be taxed from the date of filing to the time of judgment as a cost, less any interest already paid.

*Id.* at 179, 416 S.E.2d at 12; *see also Braddy v. Nationwide Mutual Liability Ins. Co.*, 122 N.C. App. 402, 470 S.E.2d 820, *disc. review denied and appeal dismissed*, 343 N.C. 749, 473 S.E.2d 610 (1996) (where plaintiff was injured as a result of a vehicle colliding with his motorcycle. Prior to filing his action, plaintiff received a settlement of $50,000.00 from defendant's liability insurance carrier. Thereafter, plaintiff initiated suit against defendant and his UIM carrier and received a jury verdict in the amount of $70,000.00. Although this Court did not consider the issue of prejudgment interest on appeal, it is apparent from the opinion that the trial court did not err in deducting the settlement from the jury verdict prior to assessing prejudgment interest. *Id.* at 405, 470 S.E.2d at 821).

We also find the decision in *Newby v. Vroman*, 14 Cal. Rptr. 2d 44 (Cal. Ct. App. 1992), to be instructive. There, a construction crane owned by plaintiff was damaged in an accident, and NCI, Incorporated (NCI) was hired to repair the damages. In turn, NCI hired defendant, a civil engineer, to make such repairs. Thereafter, while repairs were underway by defendant, the crane was damaged a second time. Plaintiff then filed a complaint against defendant and NCI to recover the damages allegedly caused by defendant's negligence. After the claim was filed, but before judgment was entered, NCI settled with plaintiff for $30,000.00. Subsequently, a verdict for plaintiff in the amount of $43,440.00 was entered. Plaintiff then moved the trial court to include prejudgment interest in the judgment.

In its award, the trial court calculated the total prejudgment interest on the entire judgment of $43,440.00 and allowed plaintiff all such interest from the filing date until the settlement date. However, after the date of settlement, the trial court held that plaintiff was entitled to prejudgment interest only on $13,440.00, the balance remaining after being reduced by the settlement.

In affirming the trial court's judgment, the California Court of Appeals held that in order to encourage the settlement of disputes, a plaintiff is entitled to prejudgment interest from the date of the tortious act proximately causing his or her injuries until the date a joint

tortfeasor settles with the plaintiff. *Id.* at 48. However, after the date of settlement:

> [T]he plaintiff is entitled to further prejudgment interest from the nonsettling defendants only on the remaining principal balance of the judgment after its reduction by such settlement amount. Were the rule otherwise, plaintiffs would clearly be doubly compensated by first receiving the use and benefit of a partial settlement sum, and thereafter obtaining the additional compensation of continuing prejudgment interest thereon from a nonsettling defendant.

*Id.*; *see also Casey v. State Farm Mut. Auto. Ins. Co.*, 464 N.W.2d 736 (Minn. Ct. App. 1991) (where the court held that "[p]rior to calculating prejudgment interest, collateral source payments must be deducted." *Id.* at 739).

Here, prior to filing this action, plaintiff settled with the Hospital and Dr. Pabst for the sum of $178,486.76. As noted by the California Court of Appeals, under these circumstances plaintiff would be "doubly compensated" if she were allowed to have the use and benefit of the settlement amount and then also receive prejudgment interest on the full amount of the $250,000.00 verdict. Therefore, we conclude the trial court erred in awarding plaintiff prejudgment interest on the full amount of the verdict, and we remand the case for prejudgment interest to be assessed after applying a credit in the amount of the $178,486.76 settlement to the verdict.

**[2]** Next, defendant contends the trial court erred by taxing certain costs that were not recoverable by plaintiff. Specifically, defendant contends the trial court erred by assessing expert witness fees for the testimony of three physicians since all three of these witnesses were called by plaintiff to prove identical facts in issue. Further, defendant argues that the trial court erred by taxing certain other costs against him that were not "reasonable and necessary."

In this State, the trial court has the discretionary authority to assess costs pursuant to N.C. Gen. Stat. § 6-20 (1997). *See Parton v. Boyd*, 104 N.C. 422, 423, 10 S.E. 490, 490 (1889).

Here, defendant has failed to demonstrate that the trial court exceeded its discretionary statutory authority in awarding costs; therefore, we overrule this assignment of error. *See Campbell v. Pitt County Memorial Hosp.*, 84 N.C. App. 314, 328, 352 S.E.2d 902, 910

(1987), *rev'd on other grounds, Johnson v. Ruark Obstetrics,* 327 N.C. 283, 395 S.E.2d 85 (1990).

**[3]** Defendant's final assignment of error concerns the trial court's granting of a directed verdict as to the issue of his vicarious liability for Dr. Pabst's negligence.

In ruling on a motion for a directed verdict pursuant to N.C. Gen. Stat. § 1A-1, Rule 50(a), the trial court must view the evidence in the light most favorable to the nonmovant and may grant the motion only if, as a matter of law, the evidence is insufficient to support a verdict in favor of the nonmovant. *West v. Slick,* 313 N.C. 33, 40, 326 S.E.2d 601, 605, 606 (1985). Further, when the moving party has the burden of proof, a directed verdict may be proper if (1) the credibility of the movant's evidence is manifest as a matter of law, and (2) the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn. *Bank v. Burnette,* 297 N.C. 524, 536, 256 S.E.2d 388, 395 (1979).

Our Supreme Court has stated that a "review of the modern cases indicates three recurrent situations where credibility is manifest" as a matter of law: (1) where the nonmovant establishes the movant's case by admitting the truth of the basic facts upon which the movant's claim rests; (2) where the controlling evidence is documentary and the nonmovant does not deny the authenticity or correctness of the documents; and, (3) "[w]here there are only latent doubts as to the credibility of oral testimony and the opposing party has 'failed to point to specific areas of impeachment and contradictions.' " *Id.* at 537-538, 256 S.E.2d at 396 (citations omitted).

In this case, the evidence providing the basis for plaintiff's motion for a directed verdict was documentary, *i.e.* (1) the Pitt County Memorial Hospital Medical Staff Bylaws, Rules and Regulations (Medical Staff Bylaws); (2) the Bylaws of Pitt County Memorial Hospital, Inc. (Hospital Bylaws); and (3) the Affiliation Agreement Between the East Carolina University School of Medicine and the Pitt County Memorial Hospital (Affiliation Agreement). Further, the defendant has not denied the authenticity or correctness of these documents. Therefore, the credibility of plaintiff's documentary evidence was manifest.

We now turn to the issue of whether the evidence was sufficient to clearly establish defendant's vicarious liability. In *Rouse v. Pitt County Memorial Hospital,* 343 N.C. 186, 470 S.E.2d 44 (1996), our

Supreme Court dealt with the issue of an attending physician's vicarious liability for the negligence of a resident when it announced:

"As a general rule, a physician who exercises due care is not liable for the negligence of nurses, attendants or interns who are not his employees." . . . However, "[o]ne who borrows another's employee may be considered a temporary [employer] liable in *respondeat superior* for the borrowed employee's negligent acts if [he] acquir[es] the same *right of control* over the employee as originally possessed by the lending employer."

*Id.* at 197, 470 S.E.2d at 51 (emphasis in original) (citations omitted). Further, the Court elaborated on the "borrowed employee" doctrine by stating:

Whether a[n] [employee] furnished by one person to another becomes the employe[e] of the person to whom he is loaned [depends on] whether he passes under the latter's right of control with regard not only to the work to be done *but also to the manner of performing it.* . . . A[n] [employee] is the employe[e] of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually exercises that control or not.

*Id.* (emphasis in original) (citations omitted).

In addressing whether the attending physician had the right to control the resident physician, the Court was presented with the same documents on which plaintiff now relies—the Medical Staff Bylaws, the Hospital Bylaws, and the Affiliation Agreement. The Court summarized these documents as follows:

Paragraph C of the [Affiliation Agreement] provides that "medical students and house staff shall be responsibly involved in patient care under the supervision of the Dean and the faculty of the School of Medicine." The [Medical Staff Bylaws] specify that "a patient may be admitted to the hospital only by a member of the medical staff." The [Hospital Bylaws] provide that "[o]nly a licensed physician with clinical privileges shall be directly responsible for a patient's diagnosis and treatment." Paragraph H of the [Medical Staff Bylaws] provides that "the house staff officer will only practice under the direction of the department chairman or his delegate. Each chairman is finally responsible for the action of the house staff officers in his department."

*Id.* at 200, 470 S.E.2d at 52-53. The Court then concluded by stating:

> While there is evidence in the record that the Hospital retained the authority to hire, pay, discipline, and terminate the resident physicians and the ultimate authority to grant hospital privileges to residents to perform certain tasks . . ., there is also evidence that tends to show that the Hospital delegated the right to control the resident physicians' *manner* of performance related to the provision of medical services to patients exclusively to the ECU School of Medicine's department chairperson or his delegates (i.e., ECU faculty attending physicians who had been granted clinical privileges at the Hospital), thereby allowing the resident physicians' negligence to be imputed to the attending physicians.

*Id.* at 201, 470 S.E.2d at 53 (emphasis in original).

Here, defendant was a member of the faculty at the School of Medicine and had been granted clinical privileges at the Hospital. Conversely, Dr. Pabst was a fourth-year surgical resident at the Hospital, and did not have clinical privileges. In addition, the evidence indicates the defendant controlled Dr. Pabst's "manner of performance" during the surgery, in that he advised her to apply steady pressure to insert the trocar into decedent's abdomen, an action which ultimately led to her death. Therefore, based on the reasoning of the *Rouse* Court, defendant was vicariously liable for any negligent acts of Dr. Pabst. As such, the trial court did not err by granting plaintiff's motion for a directed verdict on this issue, and this assignment of error is overruled.

In conclusion, we affirm the trial court's taxing of certain costs against defendant, as well as its granting of a directed verdict as to his vicarious liability for Dr. Pabst's negligence. Further, we reverse the trial court's award of prejudgment interest and remand the case for the assessment of prejudgment interest on the verdict after first applying a credit in the amount of the $178,486.76 settlement.

Affirmed in part, reversed in part and remanded.

Judges EAGLES and WYNN concur.